MANSFIELD & SWETT, INC., AND RIDGE HOLDING CO., BODIES CORPORATE, PROSECUTORS, v. TOWN OF WEST ORANGE, A MUNICIPAL CORPORATION, THE MAYOR AND BOARD OF COMMISSIONERS OF THE TOWN OF WEST ORANGE AND THE PLANNING BOARD OF THE TOWN OF WEST ORANGE, DEFENDANTS.

Argued October 5, 1937—Decided March 28, 1938.

Before Justices BODINE, HEHER and PERSKIE.

For the prosecutors, *Edward R. McGlynn.*

For the defendants, *Alfred J. Grosso* (*Milton M. Unger* of counsel).

The opinion of the court was delivered by

HEHER, J. On March 10th, 1936, Mansfield & Swett, Inc. (hereinafter referred to as the prosecutor), contracted to purchase from its co-prosecutor, Ridge Holding Co., a tract of land situate in the town of West Orange, at the northwest corner of Gregory avenue and Northfield road, comprising four and a half acres, and containing an old dwelling house—since demolished—and outbuildings. Shortly thereafter, it prepared and presented to the town's board of commissioners for approval a survey and map delineating a proposed subdivision of the tract into nineteen lots and two streets, the development to be known as "Shadowlawn." The lands are located in a "residential" zone delimited by the local zoning ordinance; and it is planned to erect thereon nineteen dwelling houses for sale at prices ranging between $15,000 and $18,000.

In accordance with the provisions of an existing ordinance, adopted pursuant to the authority bestowed by chapter 235 of the laws of 1930 (*Pamph. L.* 1930, *p.* 1039; *Rev. Stat.* 1937, 40:55-1 *et seq.*), creating a planning board and investing it with authority "to effect the adoption of a master plan" for the municipality, and "to adopt regulations governing the subdivision of land, to approve plats showing new streets or highways and to determine and fix the minimum sizes of lots and to establish building lines," and generally to exercise the authority conferred by the cited statute, the municipal governing body, at a meeting held on May 5th, 1936, referred the matter to the planning board "for their recommendations in the premises." That body, after public hearing had, "disapproved the proposed plan." The transcript of the minutes incorporated in the return discloses the rejection was "due to the fact" that the plan "does not conform with the developments along Gregory avenue, between Northfield road and Mt. Pleasant avenue, and that the greater number of property owners expressed their opinion objecting to same at public hearing held * * *."

The proceedings were thereupon brought into this court by *certiorari*, with the result that the "record" was "remanded

to the planning board in order that the grounds of disapproval may be 'stated upon its records' as required by the statute." 15 *N. J. Mis. R.* 441.

[Thereafter, and pursuant thereto, the planning board—by resolution adopted on June 3d, 1937—set down the reasons for the disapproving action. In substance, these are (1) that the proposed development is not in keeping with the character of the neighborhood and would so decrease the "ratables of surrounding properties" as to entail financial loss to the municipality; (2) that it would effect "an increase in density of population on the premises in question where none now exists," and would create additional traffic hazards, particularly for school children and the fire department, and place upon the municipality "the burden of additional policing" and "necessitate additional supervision of traffic;" (3) that the proposal is "contrary to the unanimous wish of practically all the property owners between Northfield road and Mt. Pleasant avenue," and is "an innovation * * * not deemed beneficial to the municipality or to the neighborhood;" and (4) that approval of the plan "would interfere with safety, health and general welfare of the community."

The primary question for determination is the constitutional validity of the cited enabling statute. The insistence is that it is violative of the due process clauses of the federal and state constitutions, in that "it deprives an owner of the proper use of his property." It is said that zoning does not embrace planning, and that the cases classifying municipal zoning as outside the general police power of the state are, by analogy, decisive of the question. *Ignaciunas* v. *Risley,* 98. *N. J. L.* 712; *affirmed, sub nom. State* v. *Nutley,* 99 *Id.* 389; *H. Krumgold & Sons* v. *Mayor, &c., of Jersey City,* 102 *Id.* 170.

But we do not perceive the analogy. While planning and zoning are sometimes considered so closely of kin as to constitute a single conception, they do not cover identical fields of municipal endeavor. Although municipal planning embraces zoning, the converse of the proposition does not hold true. They are obviously not interchangeable terms.

Zoning may not entirely exclude planning, but it obviously does not embrace planning in its entirety.

Zoning is a separation of the municipality into districts, and the regulation of buildings and structures in the districts so created, in accordance with their construction and the nature and extent of their use. This is the constitutional concept of the term. Article IV, section VI, paragraph 5 of the state constitution, effective October 18th, 1927. It is the dedication of the districts delimited to particular uses designed to subserve the general welfare. It pertains not only to use but to the structural and architectural design of buildings.

Planning, on the other hand, is a term of broader significance. It connotes a systematic development contrived to promote the common interest in matters that have from the earliest times been considered as embraced within the police power. Under the cited statute (section 5), the planning board is charged with the duty of adopting "a master plan for the physical development of the municipality, including any areas outside of its boundaries which, in the board's judgment, bear essential relation to the planning of such municipality," particularly in respect to the "general location, character and extent of streets, subways, bridges, waterways, water fronts, parkways, playgrounds, squares, parks, aviation fields," and so forth. The governing body may then, by ordinance, "establish the master plan" so prepared; and it shall thereupon (section 7) be "deemed official and conclusive with respect to the location and width of streets, highways and parkways and the location and extent of public parks and playgrounds shown thereon," and is expressly "declared to be established to conserve and promote the public health, safety, morals and general welfare." And the governing body may also, likewise by ordinance (section 11), empower the planning board "to adopt regulations governing the subdivision of land within its jurisdiction and to approve plats showing new streets or highways and to determine and fix the minimum sizes of lots and to establish building lines, except when already established by the zoning ordinance," whereupon the

board becomes invested with the authority to "approve, modify and approve, or disapprove such plat, taking due regard to its conformity with the official map." Section 12 of the act lays down the specific standard for the performance of this function. Of course, conformance to the master plan and the general provisions of the statute is essential. Of this more hereafter. The board may also be given (section 5) "the additional authority and duty of acting as the zoning commission under the full authority" of the Zoning act. Chapter 274 of the laws of 1928; *Rev. Stat.* 1937, 40:55-30 *et seq.*

The state possesses the inherent authority—it antedates the constitution—to resort, in the building and expansion of its community life, to such measures as may be necessary to secure the essential common material and moral needs. The public welfare is of prime importance; and the correlative restrictions upon individual rights—either of person or of property—are incidents of the social order, considered a negligible loss compared with the resultant advantages to the community as a whole. Planning confined to the common need is inherent in the authority to create the municipality itself. It is as old as government itself; it is of the very essence of civilized society. A comprehensive scheme of physical development is requisite to community efficiency and progress.

To particularize, the public health, safety, order and prosperity are dependent upon the proper regulation of municipal life. The free flow of traffic with a minimum of hazard of necessity depends upon the number, location and width of streets, and their relation to one another, and the location of building lines; and these considerations likewise enter into the growth of trade, commerce and industry. Housing, always a problem in congested areas affecting the moral and material life of the people, is necessarily involved in both municipal planning and zoning. And it is essential to adequate planning that there be provision for future community needs reasonably to be anticipated. We are surrounded with the problems of planless growth. The baneful consequences

of haphazard development are everywhere apparent. There are evils affecting the health, safety and prosperity of our citizens that are well-nigh insurmountable because of the prohibitive corrective cost. To challenge the power to give proper direction to community growth and development in the particulars mentioned is to deny the vitality of a principle that has brought men together in organized society for their mutual advantage. A sound economy to advance the collective interest in local affairs is the primary aim of municipal government.

The police power of the state may be delegated to the state's municipal subdivisions created for the administration of local self government, to be exerted whenever necessary for the general good and welfare. It reaches to all the great public needs; and the right of property yields to the exercise of this reserve element of sovereignty. The authority is of the essence of the social compact. The genius of organized government is the subordination of individual personal and property rights to the collective interest. In *Commonwealth* v. *Alger*, 7 *Cush.* 53, 84, Chief Justice Shaw spoke thus: "We think it is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth is * * * held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, when-

ever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise."

The principle is firmly established in our federal jurisprudence that injury to private property ensuing from governmental action in a proper sphere, reasonably taken for the public good, and for no other purpose, is not necessarily classable as a "taking" of such property within the intendment of the constitutional guaranties against the deprivation of property without due process of law, or the taking of private property for public use without compensation. *Northern Transportation Co.* v. *Chicago,* 99 *U. S.* 635, 642; 25 *L. Ed.* 336, 338; *Mugler* v. *Kansas,* 123 *U. S.* 623, 669; 8 *S. Ct.* 273; 31 *L. Ed.* 205, 213; *New York and N. E. R. Co.* v. *Bristol,* 151 *U. S.* 556, 557, 571; 14 *S. Ct.* 437; 38 *L. Ed.* 269, 272, 274; *Chicago, B. and Q. R. Co.* v. *Chicago,* 166 *U. S.* 226, 252; 17 *S. Ct.* 581; 41 *L. Ed.* 979, 990; *Gibson* v. *United States,* 166 *U. S.* 269, 271, 276; 17 *S. Ct.* 578; 41 *L. Ed.* 996, 998, 1002; *Scranton* v. *Wheeler,* 179 *U. S.* 141, 164; 21 *S. Ct.* 48; 45 *L. Ed.* 126, 137; *New Orleans Gaslight Co.* v. *Drainage Commission,* 197 *U. S.* 453; 25 *S. Ct.* 471; 49 *L. Ed.* 831; *Mills* v. *United States,* 12 *L. R. A.* 673; 46 *Fed. Rep.* 738; *Chicago, B. and Q. R. Co.* v. *Illinois, ex rel. Grimwood,* 200 *U. S.* 561; 26 *S. Ct.* 341; 50 *L. Ed.* 596.

A limitation of private property rights in land to the extent reasonably necessary to meet a public exigency is justifiable under this sovereign power. *Block* v. *Hirsh,* 256 *U. S.* 135; 41 *S. Ct.* 458; 65 *L. Ed.* 865. Ordinarily, a course of action may be deemed to be in the public interest when it

fairly tends to promote the good of the community at large. *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504. And an ulterior public advantage may support "a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use." *Noble State Bank* v. *Haskell*, 219 *U. S.* 104; 31 *S. Ct.* 186; 55 *L. Ed.* 112.

But the public necessity need not, as prosecutor maintains, be an absolute one—the thing that is indispensable in the strict narrow sense of the term. If it be required to promote the common good in a recognized sphere of activity, it is "necessary" within the intendment of this element of sovereignty so reserved to the states. If it be reasonably demanded by the general welfare, it is embraced within this power. The sweep of the police power is co-extensive with the public need as thus defined. A regulation that maintains the proper balance between collective and individual rights is ordinarily a legitimate exercise of the authority.

And this sovereign power is not limited to measures needful to subserve the public health, morals and safety; it may also be invoked to serve the public convenience and general prosperity and well-being. *State Board of Milk Control* v. *Newark Milk Co., supra; Hourigan* v. *Township of North Bergen,* 113 *N. J. L.* 143; *Cameron* v. *International Alliance, &c.,* 118 *N. J. Eq.* 11; *Chicago, B. and Q. R. Co.* v. *Illinois, ex rel. Grimwood, supra.* In the last cited case, Mr. Justice Harlan said: "The learned counsel for the railway company seem to think that the adjudications relating to the police power of the state to protect the public health, the public morals, and the public safety are not applicable, in principle, to cases where the police power is exerted for the general well-being of the community apart from any question of the public health, the public morals, or the public safety. Hence, he presses the thought that the petition in this case does not, in words, suggest that the drainage in question has anything to do with the health of the drainage district, but only avers that the system of drainage adopted by the commissioners will reclaim the lands of the district, and make them tillable

or fit for cultivation. We cannot assent to the view expressed by counsel. We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety. *Lake Shore and M. S. R. Co.* v. *Ohio,* 173 *U. S.* 285, 292; 43 *L. Ed.* 702, 704; 19 *Sup. Ct. Rep.* 465; *Gilman* v. *Philadelphia,* 3 *Wall.* 713, 729; 18 *L. Ed.* 96, 100; *Pound* v. *Turck,* 95 *U. S.* 459, 464; 24 *L. Ed.* 525, 527; *Hannibal and St. J. R. Co.* v. *Husen,* 95 *U. S.* 470; 24 *L. Ed.* 529. And the validity of a police regulation, whether established directly by the state or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable, and whether really designed to accomplish a legitimate public purpose. Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare. The foundations upon which the power rests are in every case the same. This power, as said in *Carthage* v. *Frederick,* 122 *N. Y.* 268; 10 *L. R. A.* 178; 19 *Am. St. Rep.* 490; 25 *N. E. Rep.* 480, has always been exercised by municipal corporations, 'by making regulations to preserve order, to promote freedom of communication, and to facilitate the transaction of business in crowded communities. Compensation has never been a condition of its exercise, even when attended with inconvenience or pecuniary loss, as each member of a community is presumed to be benefited by that which promotes the general welfare.' * * * If the means employed have no real, substantial relation to public objects which government may legally accomplish—if they are arbitrary and unreasonable, beyond the necessities of the case— the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action. * * * Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises

upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a 'taking' of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. * * * There are, unquestionably, limitations upon the exercise of the police power which cannot, under any circumstances, be ignored. But the clause prohibiting the taking of private property without compensation 'is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. * * *' " See, also, *Bacon* v. *Walker,* 204 *U. S.* 311; 27 *S. Ct.* 289; 51 *L. Ed.* 499; *Wulfsohn* v. *Burden,* 241 *N. Y.* 288; 150 *N. E. Rep.* 120.

And in *Hadacheck* v. *Sebastian,* 239 *U. S.* 394; 36 *S. Ct.* 143; 60 *L. Ed.* 348, Mr. Justice McKenna, in dealing with the claim of an arbitrary exercise of the police power, said (at *p.* 356): "The principle is familiar, but in any given case it must plainly appear to apply. It is to be remembered that we are dealing with one of the most essential powers of government—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. *Chicago and A. R. Co.* v. *Tranbarger,* 238 *U. S.* 67, 78; 59 *L. Ed.* 1204, 1211; 35 *Sup. Ct. Rep.* 678. To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way, they must yield to the good of the community. The logical result of petitioner's contention would seem to be that a city could not be formed or enlarged against the resistance of an occupant of the ground, and that if it grows at all it can only grow as

the environment of the occupations that are usually banished to the purlieus." See, also, *Reinman* v. *Little Rock*, 237 *U. S.* 171; 35 *S. Ct.* 511; 59 *L. Ed.* 900.

While the police power is not variable in either quality or quantity, it is coincident with the requirements of the general public welfare arising from changing conditions—social, economic, or otherwise. The complexities of modern community life necessarily impose a greater demand upon this reserve power for such reasonable supervision and regulation as may be essential for the common good and welfare. *State Board of Milk Control* v. *Newark Milk Co., supra.* They have placed reciprocal restrictions upon individual rights; and the authority may be directed to the reasonable accommodation of relative rights and duties dictated by the common interest. To borrow the language of Mr. Justice Holmes, "It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." *Noble State Bank* v. *Haskell, supra.* Again citing the same eminent authority, "circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern." *Block* v. *Hirsh, supra.* Yet the exercise of the power must bear a substantial relation to the public welfare, so defined, and be in all respects a reasonable measure for the attainment of the relief sought. *State* v. *Gaynor*, 119 *N. J. L.* 582.

It suffices to add that, in the exercise of that authority, a large measure of discretion is necessarily vested in the legislative body to determine not only what the public interest requires, but what measures are necessary for the protection of that interest. If a police measure in a legitimate field fairly tends to accomplish the purpose of the enactment, and keeps within the reasonable demands of the occasion, neither the wisdom nor expediency of the means resorted to is subject to judicial review. *Pacific States Box and Basket Co.* v. *White*, 296 *U. S.* 176; 56 *S. Ct.* 159; 80 *L. Ed.* 138; *Cooley Const. Lim.* (8th ed.) 1228, 1231. The legislature is pri-

marily the judge of the necessity of the law, and every possible presumption in favor of its validity will be indulged. It will not be declared void unless its repugnancy to a constitutional limitation is so manifest as to leave no room for reasonable doubt. A legislative enactment should not be set aside unless its unconstitutionality indisputably appears. *State Board of Milk Control* v. *Newark Milk Co., supra; State* v. *Murzda,* 116 *N. J. L.* 219. Again citing the opinion of Mr. Justice Holmes in *Noble State Bank* v. *Haskell, supra:* "Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the bill of rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the law-making power." The legislation is therefore directed to a constitutional end; and the means are reasonable and appropriate to that end.

The next insistence is that the statute contravenes "the due process clauses of both federal and state constitutions," in that "it fails to set forth any fixed or proper standards by which a planning board is to act." The cases cited treat of the constitutional limitation against the delegation of legislative power.

This point is likewise untenable. Section 9 of the statute prescribes with a reasonable degree of certainty the considerations governing the preparation of the master plan. It shall be formulated "with the general purpose of guiding and accomplishing a co-ordinated, adjusted and harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, morals, order, convenience, prosperity and general welfare, as well as efficiency and economy in the process of development; including, among other things, ade-

quate provision for traffic and recreation, the promotion of safety from fire and other dangers, adequate provision for light and air, the promotion of the healthful and convenient distribution of population, the promotion of good civic design and arrangement, wise and efficient expenditure of public funds, and the adequate provision of public utilities and other public requirements." Section 12, referred to above, specifies the "additional requisites" for the subdivision of land within the jurisdiction of the planning board.

To satisfy constitutional demands, it is essential only that the legislature declare the governing principle and policy; their effectuation may be confided to the agency created to administer the law. Here, the lawmaking body established a sufficient basic standard—sufficient in the sense that it embodies a definite and certain policy and rule of action for the guidance of the agency created to administer the law. We do not see how the legislature could have done more. Of necessity, it was required to vest in the administrative body a large measure of discretionary authority. The effectuation of the declared policy could not be had otherwise. If the administrative body is confined within reasonably definite limits, there is no unlawful delegation of power within the inhibition of the constitution. *State Board of Milk Control* v. *Newark Milk Co., supra.*

It is next urged that the planning board, in disapproving the subdivision proposed by prosecutor, "failed to act in accordance with the statute," in that the regulations adopted by it, pursuant to the authority conferred by section 11 of the statute, "do not concern the subdividing of land but relate to procedural matters and the requirements with reference to streets, curbs, sewers," and so forth. More specifically, it is said that section 11 contemplates "that the board shall formulate a uniform set of regulations governing subdivisions as a condition precedent to its decision upon all plans subsequently filed with that board."

We find this contention to be likewise devoid of substance. The statute, as we read it, makes no such requirement; nor would that be a practical course. Such subdivision must

necessarily be in harmony with the master plan, and in conformance with the specific requirements of the statute. The regulations adopted by the planning board outline the general policy; nothing more is required.

Lastly, it is insisted the disapproving action of the planning board "was arbitrary and discriminatory, and hence was beyond its delegated or constitutional powers."

We are convinced that, in the disposition of the matter, the planning board considered the views and desires of the neighboring estate owners as determinative. The board's original action was indisputably made to rest upon this ground alone. As pointed out, its minutes recite that the rejection of the plan was due to its non-conformance with neighboring "developments" and the objections of "the greater number of property owners" in the vicinity, whose several estates comprise from one to five acres and contain but one large mansion house, valued at from $50,000 to $75,000 each, and whose objections were based upon aesthetic considerations and the conviction that a development on this scale would depreciate their particular properties. One of the board's members testified that "the plan met with all" of the board's "requirements," and that approval would have been given were it not for the belief that, under the law, the board "had no choice in the matter," if the neighboring property owners "did not like it." And the subsequent resolution, adopted on June 3d, 1937, hereinbefore adverted to, bases the rejection upon this ground, among others.

This evinces a palpable misconception of the law. The standard is not the advantage or detriment to particular neighboring landowners, but rather the effect upon the entire community as a social, economic and political unit. That which makes for the exclusive and preferential benefit of such particular landowner, with no relation to the community as a whole, is not a valid exercise of this sovereign power. That authority may not be exerted to bar "the ordinary use of property * * * because repugnant to the sentiment or desires of a particular class residing in the immediate neighborhood thereof;" it may be interposed only in the event that

the "use is detrimental to the interests of the public at large." The neighboring owners do not possess the right to impose, for their own special benefit, restrictions upon the lawful use of the tract in question. *State* v. *Nutley,* 99 *N. J. L.* 389. It is not contended, nor is it within the statutory conception, that aesthetic considerations alone may govern the planning board in the discharge of its functions. And the current of authority denies that the police power may be invoked where that is the dominant aim. See *Opinion of the Justices,* 234 *Mass.* 597; 127 *N. E. Rep.* 525.

We deem it pertinent to add that a four and a half acre tract, containing a single mansion house, is not to be forever committed to that use—no matter how unprofitable or impractical it may be—because the lands in the vicinage are devoted to a like purpose. The plan submitted provides for the erection of single-family dwelling houses at an actual cost of $12,000—to sell at prices ranging between $15,000 and $18,000—upon a lot having an average frontage of seventy feet and an average depth of one hundred and thirty-eight feet. These houses are to be architecturally dissimilar; and there are similar developments in the immediate neighborhood.

In view of the board's manifest misapprehension of its authority, and its disregard of fundamental principles and statutory considerations in this and other particulars to be presently mentioned, we are of the opinion that the cause should be remanded for a re-examination and determination of the issue in the light of the correct principles. Compare *Jersey City* v. *State Water Policy Commission,* 118 *N. J. L.* 72; *Ursi* v. *County Employes Pension Commission,* 120 *Id.* 52.

For the guidance of the board in the exercise of its authority, we deem it advisable, if not indeed necessary, to observe that, on the evidence adduced, there is no substantial factual basis for the conclusion that the consummation of the proposal would result in revenue loss to the municipality through a net decrease of ratables—at least it would not be such as to affect the common welfare to a degree justifying the inter-

position of the police power. Nor do we think that increased traffic hazards constitute a valid objection to the development. It is not a sound argument that the subdivision will attract additional dwellers, and thereby increase the volume of traffic and create the need for additional police supervision. These are mere incidents of municipal growth. The proposed development, if surrounded with reasonable safeguards, will plainly not create abnormal traffic hazards inimical to the public welfare. The supervisory power bestowed upon the planning board may be exerted to protect the community against unnecessary traffic risks. That is one of the statutory designs. It is to be borne in mind that the action of the planning board upon a plan submitted is not necessarily to be a categorical affirmative or negative. The statute provides that the board may "approve, *modify and approve* or disapprove" the proposal.

The action under review is accordingly vacated, and the cause is remanded for further proceedings in conformity with this opinion.