**OAKES CONSTRUCTION COMPANY,**
**Appellant,**

v.

**CITY OF IOWA CITY, Iowa, Appellee.**

**No. 64373.**

Supreme Court of Iowa.

April 15, 1981.

Rehearing Denied May 7, 1981.

**2.** *See* Note, 56 N.D.L.Rev. 239, 255 (1980).

Marion R. Neely of Neely Law Offices, Iowa City, for appellant.

John W. Hayek of Hayek, Hayek & Hayek, Iowa City, for appellee.

UHLENHOPP, Justice.

This appeal involves a question of the scope of the authority of a city council to approve or disapprove a subdivision plat. See §§ 409.1, 409.14, and 409.15, The Code 1981.

Section 409.1 of the Code provides:

Every proprietor of any tract or parcel of land of forty acres or less or of more than forty acres if divided into parcels any of which are less than forty acres and every proprietor of any tract or parcel of land of any size located within a city or within two miles of a city subject to the provisions of section 409.14, who shall subdivide the same into three or more

parts, shall cause a registered land surveyor's plat of such subdivision, with references to known or permanent monuments, to be made by a registered land surveyor holding a certificate issued under the provisions of chapter 114, giving the bearing and distance from some corner of the subdivision to some corner of the congressional division of which it is a part, which shall accurately describe all the subdivisions thereof, numbering the same by progressive numbers, giving their dimensions by length and breadth, and the breadth and courses of all the streets and alleys established therein.

The section differed somewhat at the time of some of the events in this case, but the differences do not change the result.

■ Subject to a qualification in this particular case city councils act in an administrative capacity in carrying out statutes · such as chapter 409 of the Code. *Knutson v. State ex rel. Seberger*, 239 Ind. 656, 659, 662 n.6, 157 N.E.2d 469, 471, 473 n.6 (1959). *See also Board of Supervisors v. Department of Revenue*, 263 N.W.2d 227, 239 (Iowa 1978). Review by the district court of a council's decision is de novo. § 409.15. On the analogy of review of decisions of zoning boards of adjustment, we hold that the district court reviews the *facts* anew, but if the facts found by the court leave the reasonableness of the council's *decision* "open to a fair difference of opinion," the court may not substitute its judgment for that of the council. *Weldon v. Zoning Board*, 250 N.W.2d 396, 401 (Iowa 1977). The reasonableness of the council's decision is not open to "a fair difference of opinion," of course, if the decision is contrary to a rule of law, notwithstanding that it may be within the facts.

■ We also hold that if a party appeals from the district court's judgment, our review, on the record from district court, is the same as that of the district court. *Cf. Grandview Baptist Church v. Zoning Board of Adjustment*, 301 N.W.2d 704 (Iowa 1981) (review by this court in certiorari proceedings under section 414.18 as contrasted to review in equity proceedings under section 409.15 and Iowa Rule of Appellate Procedure 4).

The qualification in this case, to which we have adverted, relates to an additional issue: the developer's claim that the city must establish a new street outside the subdivision to connect the subdivision streets to the city street system. We will subsequently consider this question.

In 1972 a church owned an 11-acre tract of land abutting Muscatine Avenue in a residential area of southeastern Iowa City, and conveyed the tract to Courtcrest, Inc. Whether that tract was itself part of an earlier division of land into parcels, within section 409.1, does not appear; the deed to Courtcrest was by metes and bounds. In 1973 Courtcrest sold and conveyed a 2.4-acre portion of the tract to a Moose Lodge. In 1977, after plaintiff Oakes Construction Company declined to purchase all of the remaining land, Courtcrest sold and conveyed a 7.1-acre portion to Oakes, leaving Courtcrest with a 1.5-acre parcel. Both conveyances by Courtcrest also were by metes and bounds; at no time did Courtcrest plat any part of the 11-acre tract.

Oakes desired to develop its portion of the land as Oakes Meadow Addition, and prepared a "preliminary plat" under the city's development code which is chapter 9.50 of its ordinances. The city's planning staff, traffic engineer, and Planning and Zoning Commission examined the plat. The subdivision would have ten single-family lots and seventeen duplex lots, for a total of forty-four units. It would also contain two streets, both with cul-de-sacs. These streets would join near the north end of the subdivision and outlet over sixty feet of right-of-way onto the junction of Meadow Street and Brookside Drive and thence into Friendship Street, which is a "collector street" for traffic. All of these streets are residential in nature. We append a rough sketch from the exhibits. We have included the dotted lines to show Oakes' subsequent offer to eliminate the cul-de-sac in proposed Carver Street and to dead-end that street at the south boundary of the subdivision.

The planning staff was concerned that the single exit onto Meadow-Brookside would not constitute a sufficient means of ingress and egress, and also that Meadow-Brookside-Friendship would be inadequate to handle the added load of traffic. The following testimony is illustrative of substantial evidence in the record to this effect.

Donald Schmeiser, an urban planner, testified:

Q. Would you tell the Court what your concerns were about traffic and access to the subdivision and insofar as you felt the subdivision to be deficient in those regards, how you felt it to be deficient? And to answer that question, you may want to refer to Defendant's Exhibits A and B. A. Okay. Friendship Street currently is a 25-foot width, what we call an under-width street in terms of both its function and classification. You might term Friendship Street a collector street on the basis it does collect a considerable amount of traffic from that particular neighborhood, and with parking on both sides you virtually end up with one lane of traffic on Friendship Street. Well, with this proposed subdivision, accessing out to Friendship Street, it does certainly exacerbate the traffic problem on Friendship Street. The other concerns I had, of course, on any development with this many dwelling units and this particular subdivision is one means of access. And I think in a subdivision this large, there certainly should be two means of access. And if I might give an example.

Q. Sure. A. In terms of safety, I think, if we could say, for example, that response time to a fire in a residence in that particular area is extremely important in terms of two or three minutes in terms of the damage to that residence; then I think it's extremely important in terms of the access to that subdivision. The City presently has a fire station located south on First Avenue, on lower Muscatine Road. And if the alternatives were to obtain access to this subdivision via First Avenue to Muscatine Avenue via Carver Street connection to this development versus an access from First Avenue to Friendship Street again, which is certainly congested, to Meadow Street, and then into the subdivision, I think we're talking—I think most would agree that certainly the number of minutes of response time to a fire in that particular subdivision can be extremely critical in terms of the damage to a residence which is on fire. I think the same thing is true with emergency situations, with heart attack victims or any other type of emergency or safety situation. There's also the possibility that with one means of access at any one time, that access could be, let's say, barred from access, both in terms of getting out of the subdivision or getting in. We've seen many of that— much of that happen in terms of the snow removal problems that we've had over the past winter. And I think for those reasons and by the fact that there is no north-south continuity between South-

lawn Drive and First Avenue, which is almost a half a mile in distance, that there does need to be some north-south continuity, both to the area and for better access to this particular subdivision.

Douglas Boothroy, another planner, testified:

Q. Now, Mr. Boothroy, what kind of street is Friendship in terms of its size and design; do you know? A. It's 25 feet wide back to back, for 25 feet wide paving. It serves as a collector street for this neighborhood that's bounded by Court. Excuse me. It's bounded by Court Street, First Avenue, Muscatine and what some day will be Scott Boulevard.

Q. All right. How is the traffic— what are the traffic loads on Friendship at the present time in terms of, you know, whether it's below capacity, at capacity, above capacity? Just how heavily traveled a street is Friendship and do you have any concerns about that? A. I talked to Jim Brachtel [traffic engineer] about it, and he said that at peak times there was congestion at the intersection of Friendship and First Avenue; that it would make sense for another alternative to relieve some of this traffic flow at that point, and the additional loading of this subdivision would cause some additional problems at that intersection.

Q. Now, what about Brookside Drive, what kind of street is Brookside Drive? A. It's also 25 feet wide.

Q. And is it a typical—is it a residential street, Mr. Boothroy? A. It is a residential street, but it does provide a certain amount of circulation for this part of the neighborhood to get either to Friendship Street or out to the south on Southlawn. So it's—it's more than just a short local street, yes.

Q. Okay. But it is developed as a residential street; that is to say, there are houses on either side? A. They're all residential streets, yes.

Q. Okay. So that for someone to get in or out of that subdivision as proposed, the person would have to drive, let us say,

out—they would have to drive up to Brookside, then back on Brookside over to Friendship, Friendship east or west, presumably west, to First Avenue and then continue their trip; is that correct? A. That would be one way, yes.

Q. Now, if someone wanted to travel south of the subdivision as proposed, I take it they would either have to again drive north to Brookside, north on Brookside to Friendship, and then Friendship either west to First Avenue or east down to Eastwood, take Eastwood to Southlawn Drive; is that correct? A. That would be, yes.

Q. And at Southlawn Drive down to Muscatine; is that correct? A. Yes.

Q. Now, as I understand it, and your map does show a school located on Southlawn Drive. Did you have any concern about the school in relation to this traffic problem? A. In looking at these streets that serve this neighborhood to the south, at certain periods of time during the day with the buses coming in and out and other types of things, pedestrian traffic and children, there's a lot of points of conflict on Southlawn.

Q. What are points of conflict, Mr. Boothroy? What does that word mean? A. There are a lot of elementary school kids crossing the street. There are a lot of parents bringing kids to the facility in and out of the drives and so forth. And it becomes congested, yes.

The staff report stated regarding the access problem:

As proposed, the development of the subject area would not be conveniently accessible from major streets. The developer is planning to provide only one means of access to the subdivision of approximately 11 single family lots and 17 duplex lots (39 units total) [sic]. This access would also necessarily serve any development in the future of the RIA area directly west (approximately 8 acres). This will present traffic circulation and safety problems to both the subdivision and the neighborhood. Traffic to and from this residential area would use

Friendship Street, an undersized minor collector which at peak traffic periods is at capacity (particular from Meadow Street to 1st Avenue), or be forced to a less desirable, more circuitous route on local residential streets not capable of handling resulting increased traffic loads (e. g., an indirect route following Meadow Street to Ferndale to Terrace Road to Court Street, or Brookside Drive to Eastwood Drive to Southlawn Drive to Muscatine Avenue). In addition to this impact, this residential area would not be easily accessible to emergency and service vehicles.

The design of this subdivision needs to account for its impact on the existing neighborhood. This impact can be accommodated by provision for a secondary means of access from the subdivision to Muscatine Avenue. Also, provisions need to be made in this subdivision for extension of a street west into the undeveloped RIA area. This street should intersect with Meadow Street extended at a point approximately 450 feet from the intersection of Brookside Drive and Meadow Street.

Mary Neuhauser, who had served for a considerable time as a council member and former mayor, testified:

Q. Okay. In this case, Plaintiff's Exhibit 1 shows 10 single-family lots and 17 duplex lots, which would presumably provide a maximum of 44 dwelling units. Do you recall, in the time that you've been on the Council both as a Council member and as Mayor, ever approving, to the best of your recollection, any subdivision plat where there would be this many dwelling units serving—being served by only one street access? A. I don't recall any.

Another witness gave similar testimony.

Other evidence was introduced on the insufficiency of the access, including testimony regarding traffic congestion which would result at a nearby school, overload on neighboring residential streets, and the problem of subsequent access to additional subdivisions which will probably be devel-

oped. A comprehensive city plan is not involved, as none existed at the time of these events.

Oakes endeavored to show that past councils had approved subdivisions with single accesses. One was Oakwood Part III, which had 26 single-family lots with only one access for a period of time; another was Dean Oakes First Addition with 27 single-family lots; a third was Windsor Heights First addition with 50 lots (the addition's streets were, however, subsequently connected to those of the adjoining subdivision); Parkview Terrace with 126 lots, platted sometime prior to 1962; and Weeber's Addition with 27 single-family lots platted in about 1971. The record does not show that the circumstances surrounding these subdivisions were comparable to the present ones, and the question also arises whether the present council is bound to approve the Oakes' plat because of prior plats, if the proposed access is in fact insufficient.

Notwithstanding the adverse views of staff, the Planning and Zoning Commission approved the plat. After a number of discussions of the subject by the council at its meetings, with Oakes' attorney present at several of them, the council unanimously disapproved the preliminary plat because of insufficient access to the subdivision and because Courtcrest did not previously plat the area when it divided the 11-acre tract into three parts. Oakes appealed to the district court, which affirmed. Oakes then appealed to this court.

■ I. *Sixty-day approval or rejection.* Oakes initially claims that the council's disapproval is invalid under section 409.15 of the Iowa Code because disapproval came more than sixty days after Oakes filed the plat. He is right on the time period. The question is whether he is right in his conclusion that the council could not disapprove the plat. The first sentence of section 409.-15 provides that if the council does not approve or disapprove a plat within sixty days from the application, "the person proposing said plat shall have the right to file the same with the county recorder, assessor

and auditor." We need not decide whether a council can approve or disapprove a plat after sixty days if the developer has not yet filed it with the recorder, assessor, and auditor. The record in this case demonstrates that Oakes never got as far as a section-409.15 plat.

The process of platting a subdivision, with such problems as streets, sewers, and utilities, can be complex, and the preliminary procedure in chapter 9.50 of the city's ordinances permits difficulties to be ironed out on a preliminary plat before a developer incurs the considerable expense of a section-409.15 plat prepared pursuant to sections 409.30 (monumentation) and 409.31 (nineteen requirements for the permanent plat itself). *See* Note, *Subdivision Regulation in Iowa*, 54 Iowa L.Rev. 1121, 1136–37 (1969). We may assume arguendo that Oakes could have originally bypassed the preliminary plat provisions of chapter 9.50 of the ordinances and presented a final plat under chapter 409 of the Iowa Code, so that the sixty-day provision of section 409.15 would have come into play. The provision did not come into play because Oakes did not take that course. *Pekar v. Town of Veteran Planning Board*, 58 A.D.2d 703, 704, 396 N.Y.S.2d 102, 103 (1977) (mem.). In this case we are thus not required to say whether a developer can legally ignore chapter 9.50 and initially take his chances on a final chapter-409 plat. This record does not present those facts.

We do not find merit in Oakes' first claim.

II. *Courtcrest's failure to plat.* Oakes next claims that the council was legally wrong when it disapproved the plat on the ground that the 11-acre tract had previously been subdivided without platting. This claim by Oakes is meritorious.

We may first assume for the purposes of this case that when Courtcrest sold off two parts of the 11-acre tract, although at different times, section 409.1 required Courtcrest to plat. This is the Attorney General's opinion in such situations. Rep. Iowa Atty.Gen. 475 (1972), 713, 653 (1970). What are the consequences of Courtcrest's failure to plat?

Chapter 409 provides the consequences, but none of them prevents the proprietor of land who fails to plat from conveying the land to grantees, or a grantee from platting the part conveyed to him if his plat is otherwise proper. Section 409.2 seeks to protect a grantee by making the proprietor's duty to plat a covenant of warranty; the grantee may recover damages from the proprietor who does not plat. The proprietor is also subject to a fine of fifty dollars for each lot or part of a lot "disposed of, leased, or offered for sale." § 409.45. Under some ordinances—the question is not now raised under this ordinance—cities may withhold building permits unless the grantee plats his land and his plat is approved. *K–Line Farms, Inc. v. Waterloo Board of Review*, 275 N.W.2d 424, 425 (Iowa 1979).

Probably the most serious consequences for the grantee from the proprietor's failure to plat are the practical problems the grantee encounters when he tries to plat the land conveyed to him. This case affords an example. Courtcrest divided the original 11-acre tract into three parts by the conveyances to the Moose Lodge and Oakes. In conveying the 7.1-acre tract to Oakes, Courtcrest cut Oakes off from direct access to Muscatine Avenue by retaining a strip between Oakes' land and Muscatine, which Oakes refused to buy. Oakes was a developer, the land was in a growing residential area, and the prospect must have been obvious that Oakes would try to develop its parcel into residential housing. Assuming section 409.1 applied when Courtcrest conveyed to Oakes, the duty was on Courtcrest, by platting, to involve the city in the planning at that juncture. Courtcrest did not do so, and Oakes has a tract separated from Muscatine and a difficult platting problem as a result. Even Oakes' engineer testified that if Courtcrest had drawn in the city at that earlier time, the city would have considered a connection of Friendship on the north to Muscatine on the south.

■ We are satisfied from chapter 409, however, that the city cannot deny Oakes a

plat of the Oakes' tract on the ground, standing alone, that Courtcrest did not plat. Oakes holds fee title to the land it purchased and, if it can overcome the practical problems and present a proper plat, it cannot be denied approval on the ground that Courtcrest previously failed to plat. *See Pangborn v. Westlake*, 36 Iowa 546, 549 (1873); *Watrous & Snouffer v. Blair*, 32 Iowa 58, 63 (1871); *Annot.*, 77 A.L.R.3d 1058 (1977). Were the rule otherwise, developers and other purchasers would have to search back indefinitely to ascertain if conveyances had previously been made which brought the land in question within section 409.1.

This claim by Oakes is well taken. We of course indicate no opinion as to Oakes' rights against Courtcrest, if any, growing out of Courtcrest's failure to plat. Courtcrest is not before the court.

III. *Extent of council's authority.* We pass then to the main problem in the case: whether, on the merits, the council's disapproval of Oakes' preliminary plat can stand. The problem has three facets: whether as a *factual* matter the council was right in finding the access to the subdivision is inadequate, whether the council could *legally* disapprove the plat on the basis of inadequate access, and whether Oakes can compel the city to establish a street *outside* the subdivision from Muscatine Avenue to the subdivision south line.

A. From the evidence we have no doubt the council was right in finding the *fact* to be that the proposed subdivision would have inadequate access for traffic. Both the staff and the council viewed the subdivision as desirable, and sought methods by which Oakes could solve the access problem. Courtcrest proved uncooperative. One suggestion was a passageway for emergency vehicles, temporary until Courtcrest may eventually develop its land, over the lodge's parking lot and driveway to Muscatine Avenue. This was rejected as an unsatisfactory way of working out the problem, and properly so. Emergency vehicles are only part of the traffic problem. Moreover, no one knows when or whether Courtcrest will develop its land, and its principal stockholder would not say. The council was not obliged to accept this make-shift arrangement into its street system. Oakes' principal stockholder testified, "A couple others [council members], I think, said no, that it just wouldn't be feasible to maintain that road, or that temporary road, and how would you have it temporary and for emergency vehicles only. And there was just too many problems with that." In addition, some discussions occurred about the city's condemning an outlet from the subdivision through Courtcrest's land to Muscatine, and Oakes' contributing $10,000 to the cost. Nothing came of this. The access problem was not solved.

■ On the fact question of the necessity for a second access, we hold for the city. The council properly found that with a density factor as high as this proposed subdivision has—forty-four units plus two streets on 7.1 acres—a single means of ingress to and egress from the subdivision is inadequate. The overload on Brookside, Meadow, and Friendship increases the need for an additional outlet to the south.

B. With the necessity for additional access an established fact, we approach the second facet: whether the council could *legally* consider insufficient access in passing upon the plat. Access is not specifically enumerated as a requirement in chapters 9.50 and 409. Oakes contends, therefore, that the council can in no case consider it. This contention requires us to construe those chapters. In construing legislation we give it a reasonably liberal interpretation which will further the apparent intent and object of the legislative body. § 4.2, The Code; *Krueger v. Fulton*, 169 N.W.2d 875, 877 (Iowa 1969).

Under chapter 409 in an earlier form, this court held that city councils had little leeway with plats. They were required to approve plats as tendered which met the express statutory requirements; nothing else could be considered. *Carter v. City Council*, 180 Iowa 227, 230, 163 N.W. 195, 196 (1917); *Burroughs v. City of Cherokee*, 134 Iowa 429, 431, 109 N.W. 876, 877 (1906);

*Giltner v. City Council*, 128 Iowa 658, 659, 105 N.W. 194, 194 (1905). Numerous decisions to the same effect from other jurisdictions could be cited. Illustrative are *Land/Vest Properties, Inc. v. Town of Plainfield*, 117 N.H. 817, 822, 379 A.2d 200, 203–04 (1977); *Longridge Builders, Inc. v. Planning Board*, 92 N.J.Super. 402, 408, 223 A.2d 640, 644 (1966), *aff'd*, 98 N.J.Super. 67, 236 A.2d 154 (1967), *aff'd*, 52 N.J. 348, 245 A.2d 336 (1968).

Since the time of the cited Iowa decisions, however, many states have by statute broadened the control of local governments over subdivisions and additions. Part of the rationale of these statutes is stated thus in a Note, *Subdivision Regulation in Iowa*, 54 Iowa L.Rev. 1121, 1122–23 (1969):

> Once an area of the city is developed, the cost of change becomes prohibitive, and it becomes evident that a subdivider has cast the pattern for the future community. Since urbanization of raw land at the city's edge is now the most important development area, it is here that the most significant public influence should be exerted. Although the individual subdivider may see his particular subdivision as a complete unit, the planning agency or commission must necessarily view it as a segment of an entire community. It is therefore apparent that the initial factor that should encourage the interest of the community in effective subdivision control is the permanence of the development itself.
>
> In addition to the permanence of the development, as society becomes more complex the community is called upon to furnish additional services and to extend existing facilities to its new subdivision residents. The municipality, for instance, will have to provide extended police and fire protection, make provision for garbage disposal, and install gas, telephone and electric utility service. By providing these services the city should have the opportunity to make sure that the streets are wide enough to facilitate fire fighting equipment and that the lots are large enough to prevent fire hazards and ensure utility easements. The layout and construction of streets should be capable of handling present and anticipated traffic and of providing adequate parking. To provide for the general health, the community must demand that drainage be adequate to prevent flooding, that facilities be sufficient to provide for disposal and treatment of sewage and that a sanitary and ample water service be made available. Concern must also be given to provisions for the educational and recreational facilities demanded by the new subdivision. By the enforcement of subdivision regulations the community will be alerted to the possibility of the new services it will be forced to provide.

*See also* Tomain, *Land Use Controls in Iowa*, 27 Drake L.Rev. 254, 300–03 (1977–1978).

In 1931 the Iowa General Assembly enacted such a statute. 44 G.A., ch. 165 (now incorporated in section 409.14 of the Code). As applied to Iowa City, the pertinent part of section 409.14, for present purposes, provides:

> Said plats shall be examined by such city council, and city plan commission where such exists, with a view to ascertaining whether the same conform to the statutes relating to plats within the city and within the limits prescribed by this section, and whether streets, alleys, boulevards, parks and public places shall conform to the general plat of the city and conduce to an orderly development thereof, and not conflict or interfere with rights of way or extensions of streets or alleys already established, or otherwise interfere with the carrying out of the comprehensive city plan, in case such has been adopted by such city. If such plats shall conform to the statutes of the state and ordinances of such city, and if they shall fall within the general plan for such city and the extensions thereof, regard being had for public streets, alleys, parks, sewer connections, water service, and service of other utilities, then it shall be the duty of said council and commission to endorse their approval upon the plat submitted to it; provided that the city coun-

cil may require as a condition of approval of such plats that the owner of the land bring all streets to a grade acceptable to the council and comply with such other reasonable requirements in regard to installation of public utilities, or other improvements, as the council may deem requisite for the protection of the public interest.

In addition, chapter 9.50 of the city's ordinance begins thus in section 9.50.1(B):

This Chapter is to provide for the harmonious development of Iowa City for the coordination of streets within subdivisions with other existing or planned streets, for adequate open spaces, for traffic, recreation, light and air, and for distribution of population and traffic which will tend to create conditions favorable to health, safety, and general welfare.

Section 9.50.5(A)(1) provides:

New subdivisions shall make provisions for continuation and extension of arterial and collector streets.

In construing these provisions, the choice is between the strict approach which Oakes advocates and a more liberal one. A strict approach will more likely avoid favoritism by city councils and heavy-handedness by local bureaucracy. While platters do have some protection in the de novo court review, litigation puts them to expense and the courts defer to factually-supported council decisions which appear "reasonable." The strict approach, whereby a council must be able to point to an explicit provision on which it bases disapproval of a plat, undoubtedly affords the platter more certainty.

The more liberal approach has the advantage of permitting disapproval of plats which actually contain flaws that violate legislative intent and purpose, although the particular items are not spelled out in so many words in the legislation. This approach takes account of the likelihood that not every conceivable flaw, although it may be of considerable practical moment, can be anticipated by specific language in ordinances and statutes. It also allows the platting function to be used more effectively as an accompaniment of zoning. Cunningham, *Land-Use Control—The State and Local Programs*, 50 Iowa L.Rev. 367, 435 (1965) ("The very close relation among municipal planning, zoning, and subdivision control is obvious. Ideally, both zoning and subdivision control are tools for effectuating comprehensive land-use plans.").

■ On balance, we incline toward a reasonably liberal reading of subdivision legislation, subject to the watchful eyes of the courts under their de novo review. At the same time, we hold that councils must not approve or disapprove on whim, *see Knutson v. State ex rel. Seberger*, 239 Ind. 656, 662–63, 157 N.E.2d 469, 473 (1959), but rather on the facts of each case and on the manifest objects and purposes of the legislation. 62 C.J.S. *Municipal Corporations* § 83c, at 200–01 (1949) ("In exercising its powers a planning board or commission should act reasonably, and should be guided by factors affecting the welfare of the community, and by the provisions of the statute or charter under which it operates."). Oakes' extreme argument, that in no event can the access issue be considered because it is not expressly listed in the legislation, would permit intolerable results; a council would have to approve a single-access but otherwise proper subdivision irrespective of the number of units.

■ Applying a reasonably liberal reading to this legislation, we think a developer would understand from the quoted portions of sections 409.14, 9.50.1(B) and 9.50.5(A)(1) that provision must be made for adequate access. We hold that councils may consider access in passing upon plats.

■ Our conclusion finds support in *Prudential Trust Co. v. City of Laramie*, 492 P.2d 971 (Wyo.1972). There the court pointed out the possibility of arbitrary council action and then stated:

With that thought in mind, counsel for appellees was asked during oral argument what is needed to make appellant's plat acceptable to the city. The only deficiency which counsel mentioned in his

answer is the need for outside tie-ins to orient the platted area with other areas of the city. In other words, a need for the plat to tie the new platted area in with outside areas, as far as streets and alleys are concerned, and for these streets and alleys to correspond in width and direction and be continuations of other streets and alleys in the city or additions thereto.

The court concluded:

Our view is that the right and duty of the city to approve a plat necessarily carries with it the right to set reasonable and just prerequisites and requirements for approval of the plat, and in particular in the area of bringing the plat into conformity with other areas with respect to lots, blocks, streets, and the like.

*Id.* at 973, 974. *See Land/Vest Properties, Inc. v. Plainfield,* 117 N.H. 817, 379 A.2d 200 (1977); *Garipay v. Town of Hanover,* 116 N.H. 34, 351 A.2d 64 (1976); *Mansfield & Swett, Inc. v. Town of West Orange,* 120 N.J.L. 145, 161, 198 A. 225, 234 (1938) ("The supervisory power bestowed upon the planning board may be exerted to protect the community against unnecessary traffic risks. That is one of the statutory designs."). *See also Ross v. United States,* 7 App.D.C. 1 (1895); *Mefford v. Tulare,* 102 Cal.App.2d 919, 228 P.2d 847 (1951); *Annot.,* 11 A.L.R.2d 524, 532–37, 572–74 (1950). We hold that the access to the subdivision is inadequate, that the council could consider the subject of access, and that the council's disapproval of the plat as proposed was proper.

C. Oakes contends, however, that if it eliminates the cul-de-sac on proposed Carver Street and extends that street to the south line of the subdivision, the onus will be on the city to establish a street from that point to Muscatine Avenue through Courtcrest's property—and that this will provide the added access. Can Oakes compel the city to establish a street through the Courtcrest land?

Examination of the exhibits of platted areas in Iowa City, like the plats of other cities, together with such decided cases as *Burroughs v. City of Cherokee,* 134 Iowa 429, 109 N.W. 876 (1906), demonstrates that streets typically come about through dedication by platters. First is the townsite, in which the platter lays out lots and blocks and dedicates streets and alleys, then come adjoining additions or subdivisions in which platters dedicate more streets and alleys and tie them into those of the original townsite, and thereafter arrive more additions and subdivisions, with platters dedicating streets and alleys tied to the earlier ones.

In this case, however, an unusual problem developed from steps which were *not* taken. Despite Attorney General opinions running back to 1970, in 1977 Courtcrest conveyed a second tract of land—to Oakes—*without* involving the city through platting. Courtcrest retained a strip of land (which it offered to sell to Oakes) between Oakes' tract and Muscatine Avenue *without* extending existing Carver Street to Oakes' tract. In this situation, Oakes designed a high-density subdivision of its somewhat landlocked tract *without* first approaching the council about methods and means of obtaining an outlet to Muscatine.

Courtcrest now refuses to grant a street through the strip—this would probably be an extension of existing Carver Street to the subdivision. Its principal stockholder is reported to have said "there was no way in hell they would extend that street through his property." Furthermore, Oakes does not wish to reduce the density of the subdivision substantially and· thus reduce its profitability. Finally, the city, which was not brought into the picture until all these factors had become fait accompli, has found as a fact, and correctly, that the subdivision as proposed has insufficient access.

In this setting, Oakes asserts that if the council does not approve the plat as proposed it must establish a street from Muscatine northward to the subdivision line by condemning right-of-way through Courtcrest's land. This issue is the crux of the case.

Extending existing Carver Street does not simply mean "opening" a street; it also means establishing a street and acquiring the necessary right-of-way. The council has undoubted *power* so to establish and open an extension of Carver Street. Formerly, cities could establish streets under section 389.1 of the Code of 1973, but this section was repealed by the Home Rule Act. 1972 Sess., 64 G.A., ch. 1088, § 199. Cities now have the power to establish streets and condemn right-of-ways under the Home Rule Amendment, the Twenty-fifth Amendment to the Iowa Constitution, *see Bechtel v. City of Des Moines*, 225 N.W.2d 326 (Iowa 1975), augmented by section 471.-4(6) of the present Code giving them the power of eminent domain.

The question, however is whether Oakes can *require* the council to extend Carver Street. The general principle is that governing bodies such as city councils and county supervisors have broad discretion of a legislative nature to determine whether a street or road shall or shall not be established, initially or by extension, and that courts cannot interfere with this legislative function except in a clear case of fraud, bad faith, or arbitrary abuse of discretion. As stated in 39 Am.Jur.2d *Highways, Streets, and Bridges* § 38, at 430–31 (1968):

The duties resting upon municipal and other governmental authorities with respect to the establishment of streets or other highways are, unless imposed by positive law, of a political rather than a legal nature, the performance of which cannot be compelled by the courts, and for the nonperformance of which they cannot be held responsible. To warrant the establishment of a highway which is to be opened, constructed, or maintained at the public expense, or to warrant the exercise of the power of eminent domain for such purpose, such highway must be required by public convenience and necessity. Whether such necessity exists, however, is generally regarded as a legislative question which must be left to the discretion of the proper governmental au-

thorities. In other words, the determination as to the propriety and necessity of a proposed highway or street is final and conclusive, and is not open to judicial review in the absence of fraud, bad faith, or arbitrary abuse of that discretion. Whether a given road will subserve the public need or convenience is a question for the government alone to determine.

To the same effect see 63 C.J.S. *Municipal Corporations* §§ 1042, 1043 (1950). This principle is followed in Iowa. The court quoted Iowa decisions in *Tott v. Sioux City*, 261 Iowa 677, 680, 155 N.W.2d 502, 504–05 (1968):

"The powers thus conferred are legislative in character, and within the limits prescribed by statute are plenary. The only limit upon them which the courts have been inclined to recognize is that they shall not be exercised unreasonably." *Lacy v. City of Oskaloosa*, 143 Iowa 704, 708, 121 N.W. 542, 544, 31 L.R.A.,N.S., 853.

Under section 389.1, "a wide discretion is vested in cities and towns in the opening, control and vacation of streets and alleys. While the exercise of this power is not unlimited, yet where it is exercised in good faith, and for what it believes to be the public good, the courts will not interfere in the action of the municipality. Such interference is justified only in a clear case of arbitrary and unjust exercise of the power. (Citing cases)". *Stoessel v. City of Ottumwa*, 227 Iowa 1021, 1022–1023, 289 N.W. 718, 719; *Des Moines City Ry. v. City of Des Moines*, 205 Iowa 495, 503, 216 N.W. 284; *Morrison v. Hershire*, 32 Iowa 271, 276.

This council has refused to extend Carver Street at city expense. The specific question is whether, under these particular facts, Oakes has established a clear case of an arbitrary and unjust exercise of discretion by the council. The council's position is that Courtcrest and Oakes created the problem—Courtcrest by not platting originally, and Oakes by not buying the additional Courtcrest outlet originally and by later designing a subdivision with a higher densi-

ty than its northern easement will accommodate—and that the city should not have to bail Oakes out by a condemnation lawsuit against Courtcrest; that Oakes' failure originally to obtain sufficient outlet was due to its own lack of foresight or its unfounded hope of obtaining council approval of an inadequate outlet; that Oakes may have a right of damages from Courtcrest for not platting originally; and that the city does not desire to incur the expense of an unpredictable condemnation lawsuit and award, at public expense, in order that Oakes may develop its land to high density.

We hold on the record that Oakes has not established a clear case of arbitrary and unjust exercise of discretion by the council in refusing to extend present Carver Street at city expense.

If Oakes persists with its proposal for a high density subdivision, the council may be willing to extend Carver Street if Oakes underwrites the cost. *See* 26 Am.Jur.2d *Eminent Domain* § 36 (1966); 29A C.J.S. *Eminent Domain* § 31, at 264 (1965). This could put the situation in the posture it would have had if Oakes had originally acquired the Courtcrest strip of land or a right-of-way through it.

On the record before us, we uphold the judgment of the trial court.

AFFIRMED.

All Justices concur except McCORMICK, ALLBEE and SCHULTZ, JJ., who dissent.

McCORMICK, Justice (dissenting).

I am unable to agree with the holding in division IIIB that the city council had authority to disapprove the plat on the basis of insufficient access. The question is not the desirability of a statutory or ordinance provision or comprehensive plan delineating an access requirement. Rather it is whether the requirement can reasonably be found in an existing statute, ordinance or comprehensive plan.

The city council was acting in an administrative capacity in reviewing Oakes' plat. It had no right at that time to legislate a new condition for approval. Although the court cites section 409.14, The Code, and chapter 9.50 of the city's ordinance as providing the necessary authority, I do not believe they support the city's action.

Section 409.14 gives the city authority to ascertain whether the plat conforms to relevant statutes, city ordinances, and, if adopted, the comprehensive city plan. It then provides:

If such plats shall conform to the statutes of the state and ordinances of such city, and if they shall fall within the general plan for such city and the extensions thereof, regard being had for public streets, alleys, parks, sewer connections, water service, and service of other utilities, then it shall be the duty of said council and commission to endorse their approval upon the plat submitted to it; provided that the city council may require as a condition of approval of such plats that the owner of the land bring all streets to a grade acceptable to the council, and comply with such other reasonable requirements in regard to installation of public utilities, or other improvements, as the council may deem requisite for the protection of the public interest.

The city did not have a comprehensive plan at the time involved here. Thus, authority for disapproval of the plat must be found in statute or ordinance.

Neither the city nor the court purports to find any statutory support for the city's action outside of section 409.14. I find nothing in section 409.14 which authorizes the city to disapprove a plat because the developer does not provide a street through someone else's property. In authorizing the city to impose "reasonable requirements in regard to installation of public utilities, or other improvements, as the council may deem requisite for the protection of the public interest," the statute at most allows a requirement that a street be extended to the subdivision property line.

An analogous problem was discussed in *Baltimore Planning Commission v. Victor Development Co.*, 261 Md. 387, 393–94, 275 A.2d 478, 482 (1971):

There is little doubt that the developer can be required to deal with the problems he creates in his own subdivision but there is even less doubt that he cannot be saddled with the resolution of problems common to the area and for which he is no more responsible than other citizens. In *Baltimore v. Security Mortgage Corp., supra,* the county sought to require a developer to share the cost of building a bridge on other land and when he refused the county withheld approval of his plats. We held that "in the absence of an enforceable contract or statutory authority * * * [a county] cannot, as a prerequisite to approval of a subdivision plat require a developer or owner to defray the cost and expense of land improvements which lie beyond * * * [his] property and are on land owned by others." *Id.,* 227 Md. at 239, 175 A.2d at 757. Using similar reasoning, I would hold that the city's disapproval of the plat was not authorized by section 409.14.

Nor is the disapproval authorized by any provision in ordinance chapter 9.50. Section 9.50.1(B) is merely a general statement of purpose. Whether the city's purpose may be achieved depends on specific provisions of the ordinance. Section 9.50.5(A)(1) is the only specific provision cited by the court. That provision, however, does not purport to require continuation or extension of streets beyond subdivision boundaries. Section 9.50.5(A)(4)(k) addresses that issue. It provides: "Arterial and collector street[s] in a subdivision shall extend through to the boundaries thereof." Also relevant is section 9.50.5(A)(4)(d) which provides: "No dead-end streets or alleys will be permitted except at subdivision boundaries on unde-veloped areas." Furthermore, the street in the Oakes subdivision is within the definition of local street in section 9.50.3(B)(2)(c). The plat admittedly complied with restrictions governing cul-de-sacs in section 9.50.-5(A)(2)(b)(4).

In view of the specificity with which the ordinance imposes other requirements regarding street construction, it seems reasonable that the city should have been able to anticipate the kind of problem presented in the present case. However, it did not do so.

If the city believes access to the Oakes subdivision should be provided across the Courtcrest property to the south, it has the power to provide it. This is not a question of Oakes compelling the city to construct a street. Instead, constructing a street is a method by which the city may solve the access problem which it perceives, if it chooses to do so.

The ultimate issue in this case is whether existing legislation authorized the city to disapprove the Oakes plat because it did not provide for a street across adjacent property. I do not find such authority even under a liberal construction of the relevant legislation. Therefore, I would reverse the trial court.

ALLBEE and SCHULTZ, JJ., join this dissent.