510 A.2d 1101

**QC CORPORATION,**

v.

**MARYLAND PORT ADMINISTRATION, et al.**

**No. 1271, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 7, 1986.

Certiorari Granted Nov. 10, 1986.

---

182

Richard A. Reid and Keith R. Truffer (Royston, Mueller, McLean & Reid, on brief), Towson, for appellant.

Andrew H. Baida, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen. and J. Marks Moore, Asst. Atty. Gen., on brief), Baltimore, for appellees.

Argued before ADKINS, ROBERT M. BELL and WENNER, JJ.

ADKINS, Judge.

This case presents, among other things, questions about covenants of quiet enjoyment, constructive eviction, inverse condemnation, and sovereign immunity. In due course we shall discuss some of the facts in considerable detail. Initially, we sketch an outline of them to place the case in procedural perspective.

In 1979, Cosmin Corporation (Cosmin) leased land on Hawkins Point from appellee and cross-appellant Maryland Port Administration (MPA), a State agency.[1] The lease terminated a prior lease between the same parties. The 1979 document provided a term of five years with two five-year renewal terms at Cosmin's option. In 1981 the lease was amended to substitute appellant, Q C Corporation (Q C), as lessee. When Q C, a processor of ferrous sulfate, took possession of the leased premises, MPA (through an independent contractor) was operating a chrome waste landfill at some distance to the south of the leased premises.

Later in 1981 MPA began to develop plans to operate new chrome waste landfills immediately adjacent to the Q C plant on the north and south. By agreement with MPA,

---

1. The other appellees and cross-appellants are the State Department of Transportation (the parent agency of MPA) and the State of Maryland. For the sake of simplicity, we shall refer to all of them as MPA, which was the principal actor on the State's side of the drama.

Maryland Environmental Services subsequently commenced the new landfill operation. According to Q C, this operation caused debris and dust, containing carcinogenic chrome waste, to come upon its property. These emissions contaminated, or might have contaminated, its product and were hazardous to its employees. Q C advised MPA that because of these problems it would not exercise its first renewal option. On July 21, 1983, it sued MPA and appellees and cross-appellants Department of Transportation (DOT) and the State of Maryland in the Circuit Court for Baltimore City alleging, *inter alia*, breach of its covenant of quiet enjoyment, constructive eviction, and constructive or inverse condemnation. Later, it left the property.

MPA, DOT, and the State responded with a plea of sovereign immunity, which was rejected. The case went to trial. At the conclusion of Q C's case, the trial judge granted judgment for the defendants on the quiet enjoyment and constructive eviction counts. The inverse condemnation count went to the jury which could not agree. The judge thereupon granted the defendants' motion for judgment n.o.v. on that count.

## Issues

In its appeal Q C asserts that the trial judge erred in

1. granting the defense motions for judgment on
 a. the quiet enjoyment count and
 b. the constructive eviction count;
2. granting the defense motion for judgment n.o.v. on the inverse condemnation count;
3. granting a motion in limine excluding certain evidence; and
4. denying its motion to amend the complaint.

In a cross-appeal, MPA contends that the trial judge erred in denying the sovereign immunity plea. We shall review each of these issues, although not in the order we have listed them. Because it is a threshold issue, we turn

first to the contention of MPA that Q C's suit was barred by sovereign immunity.

*Sovereign Immunity*

An account of the history of contract sovereign immunity in Maryland may be found in Note, "Abrogation of Sovereign Immunity in Contract Cases in Maryland," 6 U. of Balt.L.Rev. 337, 344–347 (1977). We need not recount that history now. MPA argues that the statutory waiver of that immunity initially enacted in 1976 applies only to procurement contracts. Q C's lease is obviously not a procurement contract. Hence, it avers, it is immune from this suit. To resolve this issue, we must review the somewhat tortured legislative history of the immunity waiver first enacted as Ch. 450, Acts of 1976 and originally codified as Art. 41, § 10A, Annotated Code of Maryland (1978 Repl.Vol.). In its pristine form this statute read:

(a) Unless otherwise specifically provided by the laws of Maryland, the State of Maryland, and every officer, department, agency, board, commission, or other unit of State government may not raise the defence of sovereign immunity in the courts of this State in an action in contract based upon a written contract executed on behalf of the State, or its department, agency, board, commission, or unit by an official or employee acting within the scope of his authority.

(b) In any such action, the State, or its officer, department, agency, board, commission, or other unit of government is not liable for punitive damages.

(c) A claim is barred unless the claimant files suit within one year from the date on which the claim arose or within one year after completion of the contract giving rise to the claim, whichever is later.

(d) In order to provide for the implementation of this section, the Governor annually shall provide in the State budget adequate funds for the satisfaction of any final judgment, after the exhaustion of any right of appeal, which has been rendered against the State, or any officer,

department, agency, board, commission, or other unit of government in an action in contract as provided in this section.

Section 6 of Ch. 450 makes the Act applicable to any action based on a contract entered into on or after July 1, 1976. The contract between Cosmin and MPA (in which Q C was later substituted for Cosmin) was in writing and was executed after July 1, 1976. A lease is a species of contract. *Anne Arundel County v. Bowen*, 258 Md. 713, 719, 267 A.2d 168 (1970). Therefore, had this statute remained on the books without change, there could be no question that MPA could not have asserted, with any likelihood of success, the defense of sovereign immunity when Q C sued on the lease. This is apparent from the language of the statute, the purpose of which was to waive the defense of sovereign immunity on all written contracts executed on and after the critical date. As the preamble to Ch. 450 recited:

> ... The Governor's Commission to Study Sovereign Immunity believes that there exists a moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract; and
>
> ... The Governor's Commission to Study Sovereign Immunity has concluded that the doctrine is no longer appropriate to actions on certain contracts, and that the effects of this doctrine should be limited by legislative action....[2]

---

2. The Governor's Commission to Study Sovereign Immunity, under the auspices of which Ch. 450 (House Bill 885 of 1976) was introduced, was of the view that "[e]ffective 1 July 1976, the State, its counties and municipalities, cannot raise the defense of sovereign immunity on a written contract." Report of the Governor's Commission to Study Sovereign Immunity at iv (November 1976) (hereinafter "Commission Report"). *See also* Interim Report of Commission Chairman at 1 (February 1976). The Ch. 450 preamble's references to "certain contracts" refers to the fact that the immunity waiver was effective only as to written (as opposed to oral) contracts executed on or after July 1, 1976; *see* Commission Report at 101. *See also Mass*

The difficulty is that this statute did not remain on the books without change. After 1979, when the lease was executed, several things occurred. It is these legislative actions upon which MPA relies in arguing that its plea of sovereign immunity should have been sustained.

In 1977, pursuant to Resolution 28 of that year, the President of the Maryland Senate and the Speaker of the House of Delegates appointed a Purchasing and Procurement Policies Task Force. The Task Force's work came to initial fruition in 1980. Chapter 775 of the Acts of that year, titled "State Procurement of Supplies, Services, and Construction" and "generally relating to State procurement law," added to the Code a new Art. 21, "Procurement." It became generally effective July 1, 1981. Section 8 of the Act transferred to the new article all of Art. 41, § 10A, relating to waiver of sovereign immunity in contract cases. Except for minor changes in style, and for redesignation of its former subsections (a) through (d) as sections 7–101 through 7–104 of Art. 21, the language of the immunity statute was absolutely unchanged. But Ch. 775 also contained a definitions subtitle. Section 1–101(a) of new Art. 21 provided that: "In this article, the following words have the meanings indicated unless: (1) the context clearly requires a different meaning...." And § 1–101(f) defined "contract" as "every agreement entered into by a State agency for the procurement of supplies, services, construction, or any other item...."

MPA asserts that this had the effect of withdrawing the State's waiver of immunity as to non-procurement contracts prior to the institution of this suit. There is no doubt that Ch. 775 took effect before July 21, 1983, when this suit was filed. There is no doubt that the Cosmin/Q C lease was not a procurement contract as that term is defined in Art. 21, § 1–101. Nor is there any doubt that facially, at least, the word "contract," as used in the waiver of immunity statute

---

*Transit Administration v. Granite Construction Co.,* 57 Md.App. 766, 773, 780–81, 471 A.2d 1121 (1984).

in Art. 21, is subject to the definitions contained in subtitle 1 of that article.

MPA further buttresses its argument by pointing to Ch. 284, Acts of 1984, which adopted the State Government Article. Sections 12–202 through 12–204 of that article restate the provisions of §§ 7–101 through 7–104 of former Art. 21 which, as we have seen, re-enacted the language of former Art. 41, § 10A. Section 12–201 of the State Government Article purports to limit §§ 12–202 through 12–204 "only to a contract . . . as defined in Article 21, § 1–101 of the Code. . . ." The last referenced section, of course, contains the definition of "contract" that limits the word to procurement contracts.[3] We, however, are unpersuaded by these arguments.

■ What we must search out here is legislative intent. *Maryland Automobile Insurance Fund v. Sun Cab Co., Inc.,* 305 Md. 807, 506 A.2d 641 (1986). When we do so, we are not necessarily bound by a literal reading of the statute. In *State v. Petrushansky,* 183 Md. 67, 36 A.2d 533 (1944), for example, the Court of Appeals was "faced with a literal reading of a statute that would produce an absurd result." *Cohen v. Goldstein,* 58 Md.App. 699, 715, 474 A.2d 229 (1984). The Court declined to read the statute in that fashion: "To assume that the Legislature intended such a result . . . without declaring it in very definite words would be to reach a conclusion which is repugnant to common sense, and which would attribute to the legislative mind something which there is no reason to suppose it contemplated." *Petrushansky,* 183 Md. at 72, 36 A.2d 533. "Real intent must prevail over literal intent." *Id.* at 71, 36 A.2d 533. As we explained in *Cohen,* 58 Md.App. at 715–16, 474 A.2d 229:

---

**3.** By Ch. 12, Acts of 1985, Art. 21 was made Division II of the State Finance and Procurement Art. which was enacted by Ch. 11, Acts of 1985. What was § 1–101 of Art. 21 (the definition section) now appears as § 11–101 of State Finance and Procurement. What were §§ 7–101 through 7–104 of former Art. 21 are now §§ 12–202 through 12–204 of the State Government Art.

This is not a novel doctrine. It is but one emanation of the general principle that '[s]tatutes are to be construed reasonably and with reference to the purpose to be accomplished. Results that are unreasonable, illogical, or inconsistent with common sense should be avoided.' *Cider Barrel Mobile Homes v. Eader,* 287 Md. 571, 583, 414 A.2d 1246 (1980). . . .

We turn, then, to consideration of the purpose of the enactment of the 1976 waiver of sovereign immunity. What purpose did the General Assembly seek to accomplish by that measure?

The problem facing the General Assembly in 1976 was the Court of Appeals' adamant refusal to abrogate the doctrine of sovereign immunity, it being the Court's position that such a change in fundamental State policy should be effectuated by the legislature, not the judiciary. *Austin v. Baltimore,* 286 Md. 51, 405 A.2d 255 (1979).

As the *Report of the Governor's Commission on Sovereign Immunity* shows, the legislature had made several attempts to waive contract immunity prior to 1976. That goal was achieved in that year. The *Commission Report* makes pellucid that the Commission intended the 1976 bill to achieve a broad waiver of immunity, and that same objective was embraced by the General Assembly. *See* note 2, *supra,* and accompanying text, *and see* former Art. 41, § 10A. There is simply no suggestion in Ch. 450, Acts of 1976, in the *Commission Report,* or in other available legislative history, that the waiver was intended to be limited to procurement contracts.

Is there evidence that the legislative mind had changed by 1980, when new Art. 21 was enacted? The answer must be in the negative. That enactment was preceded by the *Purchasing and Procurement Task Force Report* (1978). Close scrutiny of that document produces not the slightest hint that the Task Force perceived problems that demonstrated any need to limit immunity waiver to procurement contracts. Indeed, the only explicit reference to former Art. 41, § 10A contained in the *Task Force Report* is found

in the report of a Subcommittee on Current Procurement Practices. The Subcommittee staff reviewed 383 "procurement" laws, 78 of which were recommended for transfer to proposed Art. 21. One of these was Art. 41, § 10A. *Subcommittee Report* at 8. Neither the *Subcommittee Report* nor the *Task Force Report* reveals any reason for this recommendation, or any recognition that the transfer (because of the definition of "contract" contained in proposed Art. 21) might substantially reduce the scope of the then-existing waiver of immunity in all written contract cases.

The conclusion to which this history persuades us is that the legislature did not intend its transfer of former Art. 41, § 10A to new Art. 21 to modify the waiver of immunity it had adopted in 1976. It seems likely that the General Assembly was unaware that this transfer might be read as subjecting the waiver law to the contract definition that appeared as Art. 21, § 1–101(f). Whatever result might be produced by a literal reading of the relevant Art. 21 provisions, there are no "very definite words" to convince us that we should "attribute to the legislative mind something which there is no reason to suppose it contemplated."

 Moreover, as Q C suggests, to agree with MPA's reading of former Art. 21 would raise serious constitutional questions. The subject of every law enacted by the General Assembly must be "described in its title...." Md. Const., Art. III, § 29. Failure to comply with this mandate may render all or part of an act invalid. *State's Attorney v. Triplett,* 255 Md. 270, 281–285, 257 A.2d 748 (1969). Nowhere does the title of Ch. 775, Acts of 1980, even hint that the Act in any respect dilutes the then-existing waiver of sovereign immunity. Since a statute should be given a constitutional construction when that is possible, *Berlin v. Aluisi,* 57 Md.App. 390, 470 A.2d 388 (1984), our view that the 1980 legislation did not affect the 1976 immunity waiver is reinforced.

The 1984 Act that MPA thinks supports its notion of legislative intent does not do so. Chapter 284 of that year

was a code revision bill. It is apparent that the drafters of that act undertook a literal reading of the pertinent Art. 21 provisions as they then stood, and translated that literal reading into what in 1984 became §§ 12–201 through 12–204 of the State Government Article. As our previous discussion makes clear, those Art. 21 provisions did not narrow the 1976 waiver of sovereign immunity. Their metamorphosis through code revision did not change that situation. Changes effected through the process of formal bulk code revision ordinarily do not produce substantive modifications of law.[4] *Dillsworth v. State,* 66 Md.App. 263, 269, 503 A.2d 734 (1986).

■ We hold, therefore, that the post-1976 legislative actions we have discussed were not intended to narrow the waiver of sovereign immunity in contract cases as established by Ch. 450, Acts of 1976. Our holding is fully confirmed by additional legislative action that occurred during the 1986 session of the General Assembly.

On February 7, 1986, House Bill 1684 was introduced.[5] The sponsor was Delegate Owens, who had sponsored the bill that became Ch. 450, Acts of 1976. Delegate Owens also had sponsored earlier immunity waiver bills, and was a member of the Governor's Commission to Study Sovereign Immunity. The preamble to the bill recites:

WHEREAS, Chapter 450 of the Acts of 1976 (the "Sovereign Immunity Act") which was codified in Article

---

4. Interestingly enough, an Ad Hoc Committee to Study Article 21—Procurement—apparently recognized that the correct immunity waiver provisions of former Art. 21 were not limited to procurement contracts. *Report of Ad Hoc Committee to Study Article 21—Procurement* at 85–86 (1983). But that committee's suggestion that the waiver provisions be allocated to a proposed Art. 21A, "Miscellaneous Provisions—Government Contracts" (*Report* at 85) was deferred pending preparation of the State Government Article (*Report* at 86).

5. Although MPA's brief in this case was not filed until April 24, 1986, it disingenuously failed to mention H.B. 1684 in it. At oral argument its counsel admitted awareness of the bill, which by that time had passed both houses of the legislature.

41, § 10A of the ... Code, prohibited this State and every officer, department, agency, board, commission, or other unit of State government, unless otherwise specifically provided by the laws of Maryland, from raising the defense of sovereign immunity in the courts of this State in an action in contract based upon any written contract executed on behalf of this State, or any of its ... units ...; and

WHEREAS Section 8 of Chapter 775 of the Acts of 1980 (the "Procurement Article") merely transferred, with certain stylistic changes only, the Sovereign Immunity Act from Article 41, § 10A, to the new Article 21 ..., and in doing so, may have narrowed inadvertently the scope of the Sovereign Immunity Act so as to prohibit the defense only in cases involving contracts which are subject to the Procurement Act; and

WHEREAS, the Office of the Attorney General after reviewing the matter, concluded that the General Assembly had not intended to narrow the scope of the sovereign immunity defense prohibition.... [6]

The preamble then sets forth the 1984 legislation we have described and concludes: "There consequently is a need to

---

**6.** On May 25, 1984, Attorney General Sachs advised Delegate Koss, Chairman of the House Constitutional and Administrative Law Committee, that in 1981 the Office of the Attorney General had reviewed the legislative history of the immunity waiver provision and had "concluded that, because the legislature had not indicated an intention to narrow the scope of the State's contract waiver, the Office would not raise sovereign immunity as a defense to any contract litigation" [footnote omitted]. On April 1, 1986, Assistant Attorney General Zarnoch advised Senator Miller, Chairman of the Senate Judicial Proceedings Committee, that "it has been the position of the Attorney General's Office that under § 12–201 *et seq.* of the State Government Article, immunity has already been waived with respect to non-procurement contracts" and that "if House Bill 1684 is enacted, it would clearly prevent the State from asserting sovereign immunity with respect to contracts entered into prior to July 1, 1986, as well as those entered into afterwards." It would seem that these views never trickled down to the assistant attorneys general who represented MPA in this case.

clarify the intent of the General Assembly and the scope of the Sovereign Immunity Act...."

The bill proceeds to do so by repealing § 12–201 of the State Government Article (the section that purports to apply waiver of immunity only to procurement contracts) and to re-enact §§ 12–202 through 12–204 of that article (renumbered as §§ 12–201 through 12–203) in essentially the same form of the original waiver of immunity enacted in 1976.

House Bill 1684 is now Ch. 265, Acts of 1986, effective July 1, 1986. It may sometimes be that "[t]he motives that prompt the various members of a legislature to embark upon a particular course of action may be varied and conflicting." *Cohen, supra,* 58 Md.App. at 719, 474 A.2d 229 (Bloom, J., dissenting). But we think that Ch. 265 makes transpicuous the unchanged legislative intent as to the statute involved in this case. That intent was and is to give full scope to the immunity waiver as it was adopted ten years ago. Consequently, the trial judge did not err in rejecting cross-appellants' plea of sovereign immunity.

### *Covenant of Quiet Enjoyment/Constructive Eviction*

■ We now address the merits of the issues raised by Q C in its appeal. The first two of these relate to MPA's alleged breach of the covenant of quiet enjoyment in Q C's lease and to Q C's claim that MPA constructively evicted it. Both of these contentions were rejected by the trial judge when he granted MPA's motion for judgment. Md. Rule 2–519. Because both of them arise in the same procedural context and are based essentially on the same facts, we consider them together.

With respect to the procedural context, we recall that MPA made the motions for judgment at the close of Q C's case in this jury trial. Under those circumstances, the court was required to "consider all evidence and inferences in the light most favorable to the party [Q C] against whom the motion is made." Rule 2–519(b). This standard means

that "if there is *any* evidence, however slight, legally sufficient to prove the charge, [the motion must be denied because] the weight and credibility of that evidence is for the jury." *University Nursing Home, Inc. v. R.B. Brown & Associates, Inc.*, 67 Md.App. 48, 54, 506 A.2d 268 (1986) [emphasis in original]. What was the evidence, considered in the light most favorable to Q C?

Q C was engaged in processing ferrous sulfate, "an environmentally sensitive compound used in municipal water supplies, animal feed and fertilizer." In 1981, Q C was substituted as tenant in Cosmin's lease of a 2.12 tract of land at Hawkins Point, in Baltimore City. Cosmin had also been engaged in processing ferrous sulfate, and the lease limited use of the demised premises to that of a chemical processing plant. Q C took over the Cosmin plant and improved it to the tune of $100,000, an action that seemed desirable because of the long-term nature of the lease (an original term of five years with two five-year renewal options).

When Q C occupied the premises, its landlord, MPA, was operating, through an independent contractor, a landfill for chrome ore waste received from Allied Chemical Company. This landfill was to the south of Q C's property; the activity there was at considerable distance from Q C's plant and took place at or below ground level; there was no indication that the landfill would be extended.

Later, chrome ore waste was declared to be a hazardous substance. MPA notified Allied that it would accept no more chrome ore waste. Allied thereupon sued MPA. The suit was settled. Part of the settlement included an agreement that MPA would lease property at Hawkins Point to Maryland Environmental Services (MES) which would landfill the waste there. The MPA–MES lease included land immediately adjacent to the Q C site on both the north and south, and that land was to be used only for a hazardous waste landfill. MPA then agreed with Allied to dispose of the waste in the new landfill.

In November 1981, MPA approached Q C to inquire about the availability of the latter's site for inclusion in the proposed landfill. It was suggested that Q C give MPA a figure for sale of the leasehold improvements or for the possible relocation of Q C to another site.[7] It was then that Q C learned of the new landfill plans. During 1982 further plans for the new landfill were revealed. Originally, these contemplated filling the property adjacent to Q C with chrome ore waste up to the Q C property line and to a considerable height above ground level.

In February 1983 MPA actually leased the new landfill area south of Q C to MES and disposal of chrome ore waste there commenced shortly thereafter. The landfill operation moved from south to north (*i.e.,* towards Q C). By the early summer of 1983, the entrance to the landfill was "right next to the Q C site" and vehicles hauling waste to the landfill used the same road that provided access to Q C. These vehicles, such as "[d]ump trucks carrying hazardous waste," sometimes leaked leachate or otherwise dropped hazardous waste material on the roadway. In wet weather, this mud was tracked onto the Q C property. When the weather was dry, this material would become dusty and blow onto the Q C property.

In addition, material in the landfill itself was sometimes left uncovered for up to a week. One witness testified:

> The chrome was exposed. The wind would pick it up and blow it on Q C's property. The wind seemed like it was always blowing [from the] south, right to Q C's property, right across the landfill.

Another described dust from contaminated areas of the landfill blowing towards the Q C property. Dust was seen to "migrate over the Q C area many times." A manager of the landfill testified that it was impossible to control the contamination. On one occasion a huge cloud of lime and

---

7. In early 1982 MPA informed Q C that the plant location was not required for its immediate landfill plans.

chrome ore tailings, 40 to 60 feet high, was seen to blow over the Q C property.

There was evidence that the chrome ore waste deposited in the landfill contained hexavalent chrome, a known carcinogen. There was evidence that hexavalent chrome in excess of one microgram per cubic meter of air exceeded safe limits, that less than "a cook's pinch" of that material deposited in the landfill would contain levels of hexavalent chrome in excess of one microgram per cubic meter, and that if the waste became airborne and was blown onto Q C's property there would be a hazard to the safety of its employees and the integrity of its product. There was evidence from which a jury could find that, on at least one occasion, an air monitoring test showed two micrograms of hexavalent chrome per cubic meter of air inside Q C's plant. Q C's president explained that if the company's customers became aware of the possible contamination of its product, they would no longer purchase it. A Q C employee spoke of his concern for his own health, and his need to wear a respirator when working outside the plant.

Q C's efforts to persuade MPA to assist it in reallocating its plant were unavailing. On June 13, 1983, it notified MPA that it would be unable to renew the lease because, in its view, the landfill rendered the premises untenable. Just over a month later, it filed this suit. It cut back its operations, but remained on the property until April 30, 1984, approximately the end of the original term of the lease. It then vacated the premises, removing from the site what equipment it could salvage.

We recognize that the facts we have recited were in many respects disputed, and that there is evidence in the record casting doubt on them, or raising questions as to the credibility of witnesses, their expertise, or the weight to be given their testimony. But the test we must apply is whether, considering the testimony and inferences from it most favorably to Q C, there was enough to go to the jury. We hold there was. Resolving factual disputes, determining credibility, and weighing evidence are functions for the

jury, not for the court on a motion for judgment at the end of the plaintiff's case in a jury trial. We explain.

Although Q C's lease did not contain an express covenant of quiet enjoyment, it nevertheless was the beneficiary of one. "[I]n a lease, unless the lease provides otherwise, there is an implied covenant by the lessor that the lessee shall quietly enjoy the land." Real Property Art. § 2–115. Such a covenant "insulates the tenant against acts or omissions on the part of the landlord, or anyone claiming under him, which interfere with the tenant's right to the use and enjoyment of the premises for the contemplated purposes." 3 G. Thompson, *Thompson on Real Property*, § 1130 at p. 456 (1980 Repl.Vol.). Put otherwise, the covenant is breached if the landlord's acts or omissions deprive the tenant of "'the essence of what the landlord is to provide....'" *Stevan v. Brown*, 54 Md.App. 235, 248, 458 A.2d 466, *cert. denied*, 297 Md. 110 (1983) (quoting *Chas. E. Burt, Inc. v. Seven Grand Corp.*, 340 Mass. 124, 163 N.E.2d 4, 6 (1959)). Here, the acts were performed by a party (MES) claiming under the landlord if not by MPA itself. The fact that the detrimental activities occurred on premises adjacent to those leased by Q C is immaterial because "there is an implied obligation on the part of the lessor not to derogate from his grant by so using his adjoining property as substantially to interfere with the enjoyment of the premises he has leased, and if he does use adjoining property in such a way as substantially to interfere with the use and enjoyment of the demised premises, he may be held to have breached his covenant of quiet enjoyment...." 49 Am.Jur. 2d, "Landlord and Tenant," § 339.

MPA cites *Parklawn, Inc. v. Nee*, 243 Md. 249, 220 A.2d 563 (1966) and *The Macke Co. v. Housing Management Co.*, 38 Md.App. 425, 381 A.2d 313 (1978) as supporting the trial judge's holding. They do not. *Parklawn* involved a suit for damages (nuisance) brought by a property owner against a landlord and others. One issue involved a landlord's liability to a third party for a nuisance created by his tenant. *Macke* concerned a landlord's liability to a tenant in

tort with respect to maintenance of common areas. Neither case dealt with breach of a covenant of quiet enjoyment.

Nor was the trial judge correct in concluding that breach of that covenant requires a showing that "the landlord ... must take acts, which make it factually impossible for the lessee to use his property as it was intended to be used...." Substantial deprivation of enjoyment for the intended use (here a chemical processing plant) is enough. *See Stevan v. Brown,* 54 Md.App. at 237, 458 A.2d 466 (charges of poor janitorial service, lack of heat and hot water, " 'near manic' " elevator service, accumulation of bird droppings, etc., sufficient to prevent entry of summary judgment for landlord). Enough evidence was present here to permit, although not to compel, a finding of breach of the covenant of quiet enjoyment. The question should have gone to the jury.

■ So far as constructive eviction is concerned, that occurs "when the acts of a landlord cause serious or substantial interference with the tenant's enjoyment of the property which results in the tenant vacating the premises." *Stevan,* 54 Md.App. at 240, 458 A.2d 466. The facts we have already discussed are sufficient to present a jury question as to whether MPA's acts were of that nature. In addition, however, those "acts must be done by the landlord with the intent and effect of depriving the tenant of the latter's use and enjoyment." *Id.* MPA contends that proof of the requisite intent is lacking. We disagree.

*Stevan* instructs that necessary intent "may be inferred from the nature and impact of the acts." *Id.* Reinforcing any inference that might be drawn from MPA's acts was testimony that at one point MPA had intended to acquire Q C's property for landfill purposes. A jury could (although it would not have to) conclude that this intention had never in fact been abandoned or had been revived.

It is true, of course, that Q C did not vacate the premises until almost a year after it had filed suit. A tenant "who claims constructive eviction may waive his rights if he waits

an unreasonable length of time before vacating the premises." *Stevan*, 54 Md.App. at 241, 458 A.2d 466. But whether that delay was unreasonable under all the circumstances "is usually a question of fact, not law. . . ." *Id.* This, too, was for the jury to decide.

It is also true that Q C did not actually vacate the premises until about the time the basic term of its lease had expired. That, however, does not defeat its claim. It had the option to renew for two successive five-year terms. If the jury finds the necessary facts, Q C can recover for constructive eviction from those terms. The same factual pattern occurred in *Stevan*, where tenants who had a renewal option vacated at the end of their basic term, then sued for constructive eviction. They argued "that if, at trial, they should succeed [in proving constructive eviction to the satisfaction of the fact-finder], . . . then they can recover damages for the five year renewal term of the lease that they lost when they were constructively evicted." *Stevan*, 54 Md.App. at 242, 458 A.2d 466. We agreed.

> We think this argument is legally sound, if their inability to enjoy the benefit of the renewal is established to be the result of the constructive eviction. The concept is simply that if landlords breached the lease, they cannot rely on their own wrongful act to escape liability under a lease provision the performance of which they have prevented by that wrongful act. *Id.*

*Stevan* persuades us to hold that in this case the constructive eviction count also should have been submitted to the jury, at least to the extent it relates to the renewal terms.

## *Inverse Condemnation*

It will be recalled that Q C's inverse condemnation claim was submitted to the jury, which could not agree. The judge thereupon granted judgment n.o.v. for MPA on that claim. If, in a jury trial, no verdict is returned "the court may grant the motion and direct entry of judgment. . . ."

Md.Rule 2–532(e).[8] The standard of review, when that is done, is essentially the same as that with respect to a motion for judgment at the end of the plaintiff's case in a jury trial. The motion should be denied

> if there is any evidence, however slight, from which a rational mind could infer the facts supporting the verdict of the jury. The court must assume the truth of all credible evidence on the issue and all inferences fairly deducible therefrom in the light most favorable to the party against whom the motion is made.

P. Niemeyer and L. Richards, *Maryland Rules Commentary*, p. 316 (1984). *See Coffey v. Derby Steel Co., Inc.*, 291 Md. 241, 245, 434 A.2d 564 (1981).

When the trial judge granted MPA's motion for judgment n.o.v., he applied this standard. He did not "feel that reasonable minds can find from any credible evidence in this case that there was this ... deprivation [of] essentially all beneficial use of the property...." He explained:

> To me, what is beyond dispute is really the bottom line to all of this which is whether [QC] was effectively deprived of essentially all beneficial use of its property. Even if there might be disagreement as to the actual varieties of impact for the operations of [MPA], I think what stands out very clearly ... is that whatever the degree of impact there was, that *[QC] was still not effectively deprived of all beneficial use of its property....* [emphasis supplied]

But although the judge used the proper test for granting judgment n.o.v., we believe he adopted an incorrect view of what amounts to a "taking" under the facts of this case. That is because he failed to distinguish between a "taking" that involves exercise of the police power (which is not involved here) and one that involves something tantamount to the exercise of eminent domain (which is). Again, we explain.

---

**8.** Of course, the requirements of Rule 2–532(a) and (b) must be met. There is no contention to the contrary here.

We begin with the proposition that government may not "take" private property for public use without paying just compensation to the owner. This is proscribed by the fifth amendment to the United States Constituiton, by Art. 23 of the Maryland Declaration of Rights and by Art. III, § 40 of the Maryland Constitution. *Dept. of Transportation v. Armacost*, 299 Md. 392, 420, 474 A.2d 191 (1984); *Stevens v. Salisbury*, 240 Md. 556, 563, 214 A.2d 775 (1965).[9]

Governmental "takings" of private property are frequently accomplished by the exercise of the power of eminent domain. The government files suit against the property owner to condemn the property; the property owner obtains judgment for the fair value of what is taken. *See* Real Property Art., Title 12. Sometimes, however, other types of governmental action result in what the property owner claims is a "taking." If the owner then sues the government to recover compensation, we have an action for "inverse condemnation." As the Supreme Court has put it:

> Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property, *United States v. Clarke*, 445 U.S. 253, 255–258, 100 S.Ct. 1127, 1129–1130, 63 L.Ed.2d 373 (1980). Inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Id.* at 257, 100 S.Ct. at 1130.

*Agins v. Tiburon*, 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 2140 n. 2, 65 L.Ed.2d 106 (1980). *And see* Goss, "Reverse Eminent Domain: A New Look and Re-Definition," 47 Ky. L.J. 215, 216 (1959).

---

**9.** The fifth amendment's "no taking without just compensation" provision is applicable to the states through the fourteenth amendment. *Chicago, Burlington and Quincy Railroad v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *King v. State Roads Commission,* 298 Md. 80, 83, 467 A.2d 1032 (1983).

A great many of what might loosely be characterized as inverse condemnation cases in Maryland have involved alleged "takings" accomplished via some exercise of the police power. In that type of case, assuming that the exercise of the police power is properly related to protection of the public welfare, there is no "taking" unless the owner has been deprived of all beneficial use of the property; absent proof of deprivation of that order of magnitude, no compensation is recoverable. *See, e.g., Armacost,* 299 Md. at 420, 474 A.2d 191; *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 579–80, 414 A.2d 1246 (1980); *Governor v. Exxon Corp.,* 279 Md. 410, 436–437, 372 A.2d 237 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Stevens,* 240 Md. at 568, 214 A.2d 775; *Greenberg v. State,* 66 Md.App. 24, 30, 502 A.2d 522 (1986); *Ungar v. State,* 63 Md.App. 472, 481–482, 492 A.2d 1336 (1985). It was the "deprivation of all beneficial use" standard of these cases that the trial judge applied. But this case is not a police power case.

There is a recognized distinction between alleged "takings" in an exercise of the police power and alleged "takings" by virtue of some other form of government action. "[G]overnment actions that may be characterized as acquisitions of resources to permit or facilitate ... public functions have often been held to constitute 'takings.'" *Penn Central Trans. Co. v. New York City,* 438 U.S. 104, 128, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631, *reh. den.* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). The distinction has been noted in Maryland. *Maryland-National Capital Park and Planning Commission v. Chadwick,* 286 Md. 1, 8–12, 405 A.2d 241 (1979). In *MacLeod v. Takoma Park,* 257 Md. 477, 481, 263 A.2d 581 (1970), the Court of Appeals, quoting 6 McQuillen, *Municipal Corporations,* § 24.23 (1969 Rev. Vol.), pointed to the distinction between a destruction of property under the police power and its taking without compensation. The Court observed that "inverse condemnation is a concept adopted in a scattering of jurisdictions which, as [appellee] points out, is invoked only when proper-

ty is taken or damaged for public use [*i.e.*, not when the "taking" arises from some exercise of the police power]." We recognized the distinction in *Ungar*, 63 Md.App. at 482–483, 492 A.2d 1336. Indeed, it may well be that in the strict sense inverse condemnation is appropriately applied only when there has been a non-police power taking. *MacLeod* so indicates, as does *Leet v. Montgomery County*, 264 Md. 606, 615 n. 3, 287 A.2d 491 (1972) (under doctrine of inverse condemnation "the injury to the property owner must be incident to some construction or operation of a public enterprise").

This distinction is based on the notion that the exercise of the police power is designed to prevent harm to the public through the general application of regulations that may burden some but on balance benefit all. Hence, there is a heavy onus (proving deprivation of all beneficial use) on the landowner claiming compensation. But condemnation, or inverse condemnation, in the strict sense, does not involve that sort of government activity. It implicates, instead, a more entreprenurial activity, one for the benefit of a government enterprise. Hence, compensation is more readily allowed. *McShane v. City of Faribault*, 292 N.W.2d 253 (Minn.1980). *And see Smoke Rise, Inc. v. Washington Suburban Sanitary Commission*, 400 F.Supp. 1369 (D.Md. 1975). As one scholar has explained (in the related context of eminent domain):

> [I]t may be said that the state takes property by eminent domain because it is useful to the public, and under the police power, because it is harmful.... From this results the difference between the power of eminent domain and the police power, that the former recognizes a right to compensation while the latter on principle does not.

P. Freund, *The Police Power*, § 511, pp. 546–547 (1904).

More recently, Professor Sax has articulated the same concept in a slightly different way. Noting "the distinction between the role of government as participant and the government as mediator in the process of competition among economic claims" he reasons: The losses to individu-

al property owners arising from government activity of the first type [eminent domain 'or strict inverse condemnation] result in a benefit to a government enterprise; losses arising from the second type of activity [police power] are the result of government mediating conflicts between competing private economic claims and produces no benefit to any government enterprise." Sax, "Takings and the Police Power," 74 Yale L.J. 36, 62 (1964). He proposes the following rule:

> [W]hen economic loss is incurred as a result of government enhancement of its resource position in its enterprise capacity, then compensation is constitutionally required; it is that result which is to be characterized as a taking. But losses, however severe, incurred as a consequence of government acting merely in its arbitral capacity are to be viewed as a non-compensable exercise of the police power.

*Id.* at 63.

Professor Sax's analysis, adopted virtually in *toto* in *McShane, supra,* also has been cited with approval by the Supreme Court. *Penn Central,* 438 U.S. at 128, 98 S.Ct. at 2661. *See also Chadwick,* 286 Md. at 11, 405 A.2d 241. But long before that decision, the Supreme Court reached results that foreshadowed Sax's view. A leading case is *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).[10] That case involved military flights over a chicken farm, causing the death (by fright) of many chickens. This rendered the property virtually unusable as a chicken farm, although not necessarily for other purposes. The Government argued that there was no compensable taking because, *inter alia,* the property had not been rendered unusable for all purposes (*i.e.,* the owners had not been deprived of all beneficial use). The Court agreed that

---

10. We note that "Supreme Court decisions interpreting the fifth amendment's just compensation requirement are practically direct authority for ... interpretation of the parallel provisions in the Constitution of Maryland." *Armacost,* 299 Md. at 420, 474 A.2d 191.

such a deprivation would clearly be a "taking." But held that even the lesser deprivation imposed on Causby was a "taking" that required compensation under the fifth amendment.

The Court later reached the same result in *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962)—another overflight case, but this time affecting residential property instead of a chicken farm. It earlier had come to the same conclusion in *Portsmouth Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) (firing of coast artillery over summer resort resulted in compensable taking).

In each of these three cases, government was acting in what Professor Sax characterizes as its "enterprise capacity." It was not regulating under the police power; it was engaged in a certain activity and occupied someone's airspace because to do so enhanced its ability to conduct the activity. The "taking" was, as Professor Freund put it, "useful to the public...." That same pattern is before us in the case *sub judice.*

It is plain that the State here made no effort to restrict the use of Q C's property through any statute, ordinance or similar regulation. The damage allegedly done to that property was not the result of any effort to prevent harm to the public that might result from use or misuse of Q C's leasehold. In short, the State was not acting to enforce a police power regulation. Instead, it was conducting an activity that was useful to the public—a hazardous waste landfill. Under the principle of *Griggs, Causby,* and *Portsmouth Co.,* it was exercising a power tantamount to that of eminent domain. The fact that MPA was not the operator of the landfill is of no moment. Like Allegany County in *Griggs*, 369 U.S. at 89, 82 S.Ct. at 533, MPA was the force behind the activity and the owner and lessor of the land on which it operated. If, then, MPA's actions amounted to a "taking," it was a compensable one.

We hold that there was at least a jury question on the issue of "taking." When eminent domain, as opposed to the police power, is implicated, a "taking" may occur even though the owner is not deprived of substantially all beneficial use of the property. As Chief Judge Murphy explained in *Hardesty v. State Roads Commission*, 276 Md. 25, 32, 343 A.2d 884 (1975) (holding that the State's temporary acquisition of a scenic easement was a compensable taking):

> "The modern prevailing view is that any substantial interference with private property which destroys or lessens its value (or by which the owner's right to its use or enjoyment is in substantial degree abridged or destroyed) is, in fact and in law, a 'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed [quoting Nichols, *Eminent Domain*, § 6.3 (1970)]."

That reasoning was applied, of course, in an actual eminent domain case, as opposed to a strict inverse condemnation case. There are indications that the Court has applied a more stringent rule in the inverse condemnation context. In *Baltimore v. Himmelfarb*, 172 Md. 628, 192 A. 595 (1937), for example, the Court was confronted with an inverse condemnation argument. The construction of the Orleans Street viaduct had resulted in some deprivation of light and air with respect to nearby residential property, as well as an "invasion of dust and gases" on that property. 172 Md. at 629, 192 A. 595. There was no "taking," wrote Chief Judge Bond, because "compensation may be exacted only for severe interferences which are tantamount to deprivations of use or enjoyment of property." *Id.* at 630, 192 A. 595.

But whether *Hardesty* was intended to modify the *Himmelfarb* holding, we need not decide. When the latter case is read in light of *Griggs, Causby,* and *Portsmouth Co.* (the first two of which had not been decided at the time of *Himmelfarb* and the last of which was not discussed by the Court of Appeals), we conclude that Q C has shown enough to go to the jury.

In *Griggs,* government activity substantially prevented residential use of property. In *Causby,* government activity substantially prevented operation of a chicken farm. In *Portsmouth Co.,* government activity substantially prevented the use of property as a summer resort. In none of those cases was *all* beneficial use of the property substantially prevented. In *Himmelfarb,* of course, there was no deprivation of all beneficial use; indeed, unlike the situation in the three Supreme Court decisions, there was not even substantial deprivation of residential use of the property. We think the factor absent in *Himmelfarb* is present here, and brings this case within the ambit of *Griggs, Causby,* and *Portsmouth Co.* The MPA's hazardous landfill activity had the effect, taking the evidence and inferences most favorably to Q C, of substantially depriving Q C of the use of its property as a ferrous sulfate processing plant. The Q C lease itself limited the use of the property to that of a chemical processing plant. That was the use being made of the property when the hazardous landfill activity was undertaken. As in the triad of Supreme Court cases, it was that existing use which was substantially prevented, or so a jury could have found, based on evidence we have previously discussed. That deprivation was sufficient; it was not necessary for Q C to show that the property could not be used for *any* conceivable beneficial use.[11]

The jury, of course, did not have to believe the evidence adduced by Q C as to the harmful effect of the landfill on its operations and leasehold interest. There was evidence to the contrary. There was evidence suggesting that the slow-down and eventual termination of Q C's ferrous sulfate processing was the result of economic or business

---

11. Maryland-National Capital Park and Planning Commission v. Chadwick, supra, is not to the contrary. In that case, the Court of Appeals recognized the "entreprenurial activity" concept we have discussed and found a compensable "taking" to exist when a non-police power action of the commission deprived property owners of all reasonable use of their property for a three-year period. The Court did not hold, however, that a deprivation of less than *all* beneficial use of the property could not amount to a "taking."

factors unrelated to the landfill operation. But the weighing of this evidence is a jury function, not one for the trial court on motion for judgment n.o.v., and in any event, as we have demonstrated, the proper test for "taking" was not that adopted by the judge—*i.e.*, the "substantial deprivation of all beneficial use" test. We hold that the judge erred in granting the motion for judgment n.o.v.

### *Exclusion of Evidence/Motion to Amend Complaint*

There remain for consideration Q C's contentions that the trial court erred in excluding certain evidence and in refusing to permit it to amend its complaint. Since the decision we have already made requires a remand of this case for a new trial, these issues are, perhaps, unnecessary to address. Nevertheless, since they may arise on retrial, we shall deal with them.

It will be recalled that the original term of Q C's lease expired on April 30, 1984. The lease required Q C to give its notice of its intention to exercise its first five-year renewal option at least six months prior to that date. On June 13, 1983, Q C advised MPA that, because of the conditions created by the landfill operation, it would not exercise the option. On July 21, 1983, Q C filed the instant action, alleging these facts and others relating to the landfill operation and its effect on Q C. Its original pleading charged that "[t]he foregoing facts" were sufficient to make out its claim of breach of the covenant of quiet enjoyment, constructive eviction and constructive (inverse) condemnation. Obviously, "[t]he foregoing facts" had to be facts that had existed on or before July 21, 1983.

On May 16, 1985, Q C filed an Amended Complaint. It made only minor changes in the allegations of the original pleading and again charged that "[t]he foregoing facts" supported its several claims. No different pertinent facts were set forth; no dates subsequent to July 21, 1983, were mentioned; nor was there any allegation of continuing harmful acts after July 21, 1983.

Trial was scheduled to commence on May 27, 1985, on which date the trial judge granted a motion *in limine* made by MPA. The judge ruled that Q C could prove only matters that had occurred prior to July 21, 1983. The effect of this ruling was to exclude from evidence a 1984 videotape Q C had made, purporting to show conditions at its plant. ₀The ruling also excluded evidence of soil samples taken in 1984 and certain expert testimony based on post-1983 evidence. On May 28, 1985, the judge reviewed the videotape and reaffirmed his exclusionary ruling, this time on the basis that its "prejudicial effect, together with the fact that conditions were vastly different [when the tape was made as compared to when suit was filed] ... far outweighs the probative value of that video tape."

A jury was selected and taken to view the site (over Q C's objections). On May 29, before opening statements were made, Q C moved for leave to file another Amended Complaint—this one alleging "the element of a continuing violation of various provisions of the lease and of the continuing inverse condemnation." The judge denied the motion because he thought "this substantially modifies and changes the original cause of action for which the defendants have prepared themselves."

 Questions of the admissibility of evidence are largely within the discretion of the trial judge. *Johnson v. State,* 303 Md. 487, 527, 495 A.2d 1 (1984), *cert. denied,* ——— U.S. ———, 106 S.Ct. 868, 88 L.Ed.2d 907 (1985). We hold that the judge did not abuse his discretion in granting the motion *in · limine.*[12] A plaintiff ordinarily is limited "to proof of issues as framed in its declaration [now complaint]." *Quality Discount Tires, Inc. v. The Firestone Tire & Rubber Co.,* 282 Md. 7, 30, 382 A.2d 867 (1978). The

---

12. We are aware that in *Funkhouser v. State,* 51 Md.App. 16, 24, 440 A.2d 1114 (1982), we held that "the grant of a motion *in limine* cannot in and of itself constitute reversible error." We do not depart from that holding. Q C preserved the issue here by proffering the evidence in question during trial.

issues framed by Q C in both its original declaration and its first amended complaint had to do with whether the landfill operation, as it existed prior to July 21, 1983, amounted to a breach of its covenant of quiet enjoyment, constructive eviction, and inverse condemnation. The judge's ruling merely limited the evidence to those issues, within the framework alleged by Q C.

As to Q C's efforts to amend its complaint again just prior to opening statements, leave of court was required under Md. Rule 2–341(b). And although Rule 2–341(c) instructs that "[a]mendments shall be freely allowed when justice so permits," *and see Cherry v. Brothers*, 306 Md. 84, 92, 507 A.2d 613 (1986), the allowance of an amendment, when leave is required, also is within the judge's discretion. *Ebert v. Ritchey*, 54 Md.App. 388, 394–396, 458 A.2d 891, *cert. denied*, 296 Md. 414 (1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 356 (1984). Once again, we cannot say that the trial judge abused his discretion in rejecting the belated attempt to amend and thereby escape the strictures of the *in limine* ruling. This holding, of course, has no bearing on the propriety of any amendments Q C may attempt to make prior to the retrial that will be scheduled following our remand.

JUDGMENT REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES AND CROSS–APPELLANTS.